Lieutenant Richard P. WATSON,
Plaintiff,

v.

William J. PERRY, Secretary of
Defense, et al., Defendants.

No. C95–1141Z.

United States District Court,
W.D. Washington.

March 7, 1996.

Tarl R. Oliason, McKisson & Sargent, Seattle, WA, Paul S. Schmidtberger, Coudert Brothers, San Francisco CA, Christopher J. Bakes, Bakes & Chapman, San Francisco CA, Amy A. Fraenkel, LeBoeuf, Lamb, Greene & McRae, San Francisco CA, for Plaintiff.

Mark T. Quinlivan, U.S. Department of Justice, Federal Programs Branch, Washington DC, for Defendants.

## ORDER

ZILLY, District Judge.

After fourteen years of exemplary military service, Lieutenant Richard P. Watson sub-

mitted a statement to his commanding officer declaring that he had a "homosexual orientation," and stating that he would not "rebut the [statutory] presumption" that servicemembers who state they are homosexuals engage in or have a propensity to engage in homosexual conduct. Pursuant to the Department of Defense's so-called "Don't Ask, Don't Tell" policy regarding homosexuals in the military, the Navy instituted discharge proceedings against Lt. Watson. Based on Watson's initial statement, a further statement to the Board of Review, and his failure to produce any evidence rebutting the presumption, the Navy ordered Lt. Watson's separation from service. Lt. Watson then initiated this action challenging on due process, equal protection, and free speech grounds the constitutionality of the "Don't Ask, Don't Tell" policy and implementing regulations.

The parties have now cross-moved for summary judgment. The Court heard argument on January 19, 1996, and, having considered the parties' briefs and arguments, hereby GRANTS the Government's motion for summary judgment and DENIES the plaintiff's motion for summary judgment.

### Summary of Decision

Lt. Watson has challenged the "Don't Ask, Don't Tell" policy as unconstitutional on its face. The Court does not reach this issue because the statements made by Lt. Watson to the Navy support the conclusion that the policy was constitutionally applied to him. It is well established that the armed forces may prohibit homosexual conduct. Because homosexual conduct may constitutionally be prohibited, administrative discharges based on propensity or intent to engage in homosexual acts, as evidenced by servicemembers' statements, do not violate equal protection. Here, Lt. Watson made a statement that he had not and would not engage in homosexual conduct with any military students or service members during the performance of military duty or while on any military installation. Because the Navy could properly draw an adverse inference from Watson's selective omission of any reference to off base, off duty conduct with non-military personnel, there is no basis for finding the policy was

unconstitutionally applied to him. He was not discharged solely for acknowledging his sexual orientation, but rather for making statements manifesting an intent or propensity to engage in proscribed homosexual conduct.

The Court's decision to grant the Government's motion for summary judgment should not be interpreted as an endorsement of the military's "Don't Ask, Don't Tell" policy or the way it has been applied in general. Regrettably, enforcement of the existing policy has resulted in the expulsion from the armed forces of many outstanding men and women who served their country with honor and dignity. This Court may not, however, question the wisdom of the policy or substitute its judgment for that of Congress. Rather, the Court's role is limited to determining whether the policy enacted by Congress was constitutionally applied to Lt. Watson. The Court concludes that it was.

### Background

Plaintiff Richard Watson is currently a lieutenant in the United States Navy. Lt. Watson enlisted in the Navy in July 1981. A year later, the Navy selected Lt. Watson to participate in the Enlisted Commissioning Program, under which highly qualified enlisted personnel may achieve officer status. Under this program, Lt. Watson attended the University of New Mexico, obtaining a Bachelor of Science degree in mathematics in August 1986. After completing Officer Candidate School, Naval Nuclear Power School, and the Submarine Officer Basic Course, Lt. Watson served aboard the U.S.S. Henry M. Jackson from September 1988 until September 1992. During this period, Lt. Watson received many honors including a Letter of Commendation from the Commanding Officer of the U.S.S. Henry M. Jackson, the National Defense Service Medal for Service on Active Duty, the Navy Achievement Medal for "Professional Achievement in the Superior Performance of His Duties," and a Gold Star in lieu of a second Navy Achievement Medal.

From September 1992 until March 1995, Lt. Watson served as an Assistant Professor of Naval Science in the Naval Reserve Officers Training Corps (NROTC) at Oregon

State University. During this period, Lt. Watson sought to obtain a Masters Degree in Business Administration, which he viewed as necessary for continued promotion and advancement in the Navy.

On October 28, 1994, Lt. Watson delivered to his Commanding Officer a one-page document titled "Submission of Sexual Orientation Statement." Paragraph 2 reads: "I have a homosexual orientation. I do not intend to rebut the presumption." Lt. Watson explains in his declaration that he submitted the statement (1) because of his commitment to honesty, truthfulness, and integrity, and (2) to eliminate any potential for a blackmail threat in the event he received a vessel command assignment. Based on this letter, the Navy issued a show cause order requiring Watson to show cause before a Board of Inquiry why he should be retained in the Naval Service.

On March 1, 1995, a Navy Board of Inquiry was convened. Although the Board reminded Watson that to avoid discharge he would have to rebut the presumption that he engages in or intends to engage in homosexual acts, Watson presented no such evidence. Instead, he recounted his many accomplishments during fourteen years of military service and emphasized his commitment to the Navy and its core values. Watson's counsel argued to the Board that Watson's statement, "I do not intend to rebut the presumption" was made without the assistance of counsel and without full understanding of "what a presumption is." The Board concluded that although they had no doubt that Watson was "an outstanding performer," he failed to offer any evidence to rebut the presumption. As a result, the Board voted 3 to 0 to recommend the honorable discharge of Lt. Watson "by reason of homosexual conduct."

On March 28, 1995, Lt. Watson's civilian counsel submitted a letter of deficiency for consideration by the Commander of Naval Base Seattle and the Board of Review in their review of the Board of Inquiry's recommendation. The letter included the following statement by Lt. Watson:

a. I expressly deny that I have engaged in any homosexual conduct with any military student or service member.

b. I expressly deny that I engaged in any homosexual conduct during the performance of military duty, or while on any military installation.

c. I expressly deny that I have any intent or propensity to engage in any conduct described above.

In April 1995, the Commander of Naval Base Seattle issued a report in which he approved and concurred in the Board of Inquiry's findings, and recommended to the Chief of Naval Personnel that Watson be separated from service. The Commander concluded that Watson's letter of deficiency failed to rebut the presumption and was, in fact, "persuasive as much for what it does not deny as for what it does." The "Don't Ask, Don't Tell" policy "appl[ies] to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty." 10 U.S.C. § 654(a)(10). Thus, homosexual conduct that requires separation from service is not limited to the circumstances addressed in Watson's letter of deficiency, namely off duty, off base conduct with non-military personnel. Because Watson was silent as to his intent or propensity to engage in homosexual conduct under circumstances other than described in his statement, the Commander concluded that his statement supported, rather than rebutted, the presumption.

The Commander also rejected Watson's argument, made to the Board of Inquiry, that his initial statement, "I do not intend to rebut the presumption" was made "without any counseling from lawyers," and therefore should be construed only as a statement that he did not want an embarrassing inquiry into his private life. The Commander concluded that Watson's legal ignorance was substantially contradicted by his statement that he sent copies of his declaration to various officials and interest groups on the advice of his lawyer.

On May 2, 1995, the Board of Review voted unanimously to recommend Watson's separation from service with an honorable

discharge. In June 1995, the Navy sent Lt. Watson a Notice of Discharge and an amended Notice of Discharge. The amended Notice of Discharge informed Lt. Watson that he would receive 50% of the standard separation pay.

On July 25, 1995, Lt. Watson initiated this action against Secretary of Defense William J. Perry, Secretary of the Navy John E. Dalton, and the United States. In this action, Lt. Watson challenges the constitutionality of the Policy Concerning Homosexuality in the Armed Forces (colloquially known as the "Don't Ask, Don't Tell" policy), 10 U.S.C. § 654, and the Department of Defense regulations promulgated thereunder. The statute provides in relevant part as follows:

(b) **Policy.**—A member of the armed forces shall be separated from the armed forces under regulations prescribed by the Secretary of Defense if one or more of the following findings is made and approved . . .

(2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding . . . that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

(f) **Definitions.**—In this section:

(1) The term "homosexual" means a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms "gay" and "lesbian".

10 U.S.C. § 654.

Department of Defense Directive 1332.30 further defines a "statement that a member is a homosexual or bisexual or words to that effect" as

[l]anguage or behavior that a reasonable person would believe was intended to convey the statement that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts.

Definitions ¶ 18, Department of Defense (DOD) Directive. The Directive also defines "sexual orientation" as "[a]n abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts." *Id.* ¶ 16. The Directive states that "[a] member's sexual orientation is considered a personal and private matter, and is not a bar to continued service . . . unless manifested by homosexual conduct in the manner described in section C.1." Reasons for Separation § C, at p. 2–1. Section C.1.b. repeats the language of 10 U.S.C. § 654(b)(2), and further provides:

A statement by an officer that he or she is a homosexual or bisexual, or words to that effect, creates a rebuttable presumption that the officer engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. . . . In determining whether an officer has successfully rebutted the presumption . . ., some or all of the following may be considered:

(1) Whether the officer has engaged in homosexual acts;

(2) The officer's credibility;

(3) Testimony from others about the officer's past conduct, character, and credibility;

(4) The nature and circumstances of the officer's statement;

(5) Any other evidence relevant to whether the officer is likely to engage in homosexual acts.

DOD Directive, Reasons for Separation, § C.1.b., at p. 2–2.

Lt. Watson challenges the "Don't Ask, Don't Tell" policy on First (Free Speech) and Fifth (Equal Protection and Due Process) Amendment grounds, and brings a claim under the Administrative Procedure Act (APA) challenging the Navy's refusal to provide him with full separation pay. With his complaint, Lt. Watson filed a motion for a temporary restraining order and a preliminary injunction, docket no. 2. On August 8, 1995, after hearing oral argument, the Court issued a preliminary injunction enjoining the Navy from discharging Watson or taking any adverse action against him pending the outcome of this litigation.

The parties now move for summary judgment. Lt. Watson claims that the "Don't Ask, Don't Tell" policy violates the due process and equal protection clauses of Fifth Amendment because it is based solely on prejudice against homosexuals and discriminates, without any rational justification, against homosexual servicemembers on the basis of status alone. Watson argues further that the "Don't Ask, Don't Tell" policy is aimed at suppressing protected speech and therefore cannot withstand First Amendment scrutiny.

The Government counters that it is constitutionally permissible for the armed forces to prohibit homosexual conduct, which is the aim of the "Don't Ask, Don't Tell" policy. The Government emphasizes that the policy is "conduct based," excluding only those servicemembers who engage in homosexual conduct or who make statements demonstrating that they have engaged or are likely to engage in homosexual conduct. As to plaintiff's First Amendment argument, the Government contends that servicemembers who are discharged based on their declarations of homosexuality are not being punished for their speech; rather, the Government is using the statement as evidence of prohibited homosexual conduct.

### Discussion

#### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Here, there are no material issues of fact in dispute. The parties disagree only on the application of the law to these facts. As a result, this case is ripe for summary adjudication.

#### II. Deference to the Military

■ As this Court recognized in *Cammermeyer v. Aspin*, 850 F.Supp. 910, 915–916 (W.D.Wash.1994), courts reviewing constitutional challenges to military actions must be mindful of the special level of deference accorded military decisions. While there is no "military exception" to the Constitution, "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." *Beller v. Middendorf,* 632 F.2d 788, 811 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

The Constitution confers broad powers on the President and Congress to raise and support armies, provide and maintain a naval force, and promulgate rules governing and regulating both land and naval forces. Traditionally, courts have recognized the Constitution's mandate by according significant deference to the "considered professional judgment" of military officials regarding the composition of the armed forces. *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). "While it is clear that one does not surrender his or her constitutional rights upon entering the military, the Supreme Court has repeatedly held that constitutional rights must be viewed in light of the special circumstances and needs of the armed forces." *Beller,* 632 F.2d at 810. As the Supreme Court has reflected:

> "[It] is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."

*Rostker v. Goldberg,* 453 U.S. 57, 65–66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478, 487 (1981) (quoting *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973)).

■ The plaintiff has argued forcefully and persuasively that gay and lesbian servicemembers have served honorably in the military for years; that gay and lesbian servicemembers are currently serving with distinction, without disrupting order and good discipline; that one's sexuality is a personal and private matter; and that prejudice is at the heart of the military's policy concerning gays and lesbians in the military. The Court

has no doubt that many gays and lesbians have served and continue to serve this country honorably, without impeding the goals of the military, and that many other servicemembers would like to see homosexuals ousted merely because of their sexual preference. This Court is not permitted, however, to substitute its own judgment for that of Congress and the military or to question the wisdom of the military's policy. The policy must be upheld so long as it is constitutional. It is also not within this Court's power to revisit legal issues conclusively resolved by the Supreme Court in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).[1] *See also Meinhold v. U.S. Dept. of Defense,* 34 F.3d 1469, 1477 (9th Cir.1994). As a result, the Court must reject the argument that homosexual conduct cannot be proscribed by the military. Consistent with the principles of deference to the military and binding precedent, the Court's task is limited to determining whether the policy unconstitutionally infringes on Lt. Watson's constitutional rights as considered in the context of the military.[2]

### III. *Must Lt. Watson Exhaust His Administrative Remedies?*

■ The defendant argues that this Court should require Watson to exhaust intramilitary remedies before adjudicating his constitutional claims. In *Meinhold,* the Ninth Circuit rejected a similar argument by the Government, noting that appeal to the Board for the Correction of Naval Records (BCNR) would have been futile. The Court concluded that because the Navy's position was that the Board had to recommend separation if it found Meinhold to be homosexual, and that a servicemember is homosexual if he makes a statement that he is, there would be no grounds on which the BCNR could reach a different disposition than the Board. The same reasoning applies here. Because Watson failed to submit any evidence to rebut the presumption, there would be no basis for the BCNR to reach a contrary result. As a result, the Court concludes that exhaustion is not required because further administrative proceedings would be futile.

■ The Court also concludes that constitutional review is not precluded by the Administrative Procedure Act ("APA"). In *Darby v. Cisneros,* 509 U.S. 137, 137, 113 S.Ct. 2539, 2540, 125 L.Ed.2d 113, 127 (1993), the Supreme Court held that "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." (Emphasis in original). Because appeal to the Board for the Correction of Naval Records is discretionary, not mandatory, Watson is not precluded from bringing claims under the APA. *See* 10 U.S.C. § 1552.[3]

---

1. *Hardwick* involved a due process challenge to a Georgia statute which made sodomy a crime. Hardwick challenged the statute after being discovered engaging in sodomy with another consenting adult in the privacy of his own home. The Supreme Court held that the Constitution confers no fundamental right upon homosexuals to engage in sodomy.

2. The "Don't Ask, Don't Tell" policy has been challenged on constitutional grounds in several cases. The policy has been upheld as applied in *Richenberg v. Perry,* 909 F.Supp. 1303 (D.Neb. 1995) (Captain in the Air Force was discharged for stating he is a homosexual); *Philips v. Perry,* 883 F.Supp. 539 (W.D.Wash.1995) (Petty Officer was discharged for stating he engaged in homosexual acts and was a homosexual); and *Selland v. Perry,* 905 F.Supp. 260 (D.Md.1995) (Lieutenant in the Navy was discharged for making statement that he was homosexual and involved in a monogamous relationship). Only one court has held that the policy is facially invalid on equal protection, due process, and First Amendment grounds. *See Able v. United States,* 880 F.Supp. 968 (E.D.N.Y.1995) (six members of the Armed Services made statements of homosexual orientation). Several of these cases are currently on appeal.

3. Lt. Watson clarified in his briefs that his sole claim under the APA relates to the Navy's failure to award him full separation pay, which becomes an actual controversy only if he is eventually discharged. Plaintiff is not bringing a claim under the APA based on the Navy's actions in discharging him because he does not believe the Navy exceeded or acted contrary to statutory authority. Watson contends that the Navy acted in conformity with, rather than against, the policy and regulations at issue here. Because it is the policy and regulations themselves which are allegedly unconstitutional, plaintiff contends he has no APA claim based on the agency's adherence to that policy; instead, "the only route

## 1412

### IV. Equal Protection Challenge

#### A. Standard

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). While the Fifth Amendment does not contain an equal protection clause, the due process clause of the Fifth Amendment has an equal protection component that applies to the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

The Ninth Circuit has held that homosexuals are not a suspect or quasi-suspect class for equal protection purposes; therefore, judicial review of a classification based on homosexuality is limited to the rational basis test. *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 571 (9th Cir.1990). Under this standard, a discriminatory classification is presumed valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 312, 113 S.Ct. 2637, 2638–39, 125 L.Ed.2d 257, 270 (1993).

Rational basis review is a two-step process. *Jackson Water Works, Inc. v. Public Utilities Comm'n,* 793 F.2d 1090, 1094 (9th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987). Initially, the court must determine whether the challenged classification serves a legitimate governmental purpose. If the court answers this question in the affirmative, the court must then determine whether the discriminatory classification is rationally related to the achievement of that legitimate purpose. A discriminatory classification that is based on prejudice or bias is not rational as a matter of law. *See Palmore v. Sidoti,* 466 U.S. 429,

433–34, 104 S.Ct. 1879, 1882–83, 80 L.Ed.2d 421, 426 (1984) (mother could not be denied custody of her child based on social disapproval of her interracial marriage); *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 326 (city could not require a special use permit for group home for the mentally retarded where the requirement was based on prejudice).

Plaintiff does not dispute that the government has a legitimate interest in maintaining the readiness and combat effectiveness of its military forces. Thus, the first part of the test is satisfied. The parties disagree, however, as to the second part of the test—whether the classification is rationally related to that purpose.

#### B. Is the Policy Unconstitutional on its Face?

In *Meinhold,* 34 F.3d at 1478, the Ninth Circuit, in addressing the equal protection implications of the military's former policy concerning homosexuals in the armed forces, recognized that equating status with conduct or acts that are prohibited is "problematic," and questioned whether it could ever be "rational to presume that one class of persons (identified by their sexual preference alone) will violate regulations whereas another class (identified by their preference) will not." The court avoided reaching the constitutional question, however, because it construed the former policy as permitting discharge from service only where the servicemember makes "statements that show a concrete, fixed, or express desire to commit homosexual acts." *Id.* at 1479. The court found that Meinhold's statement, "I am in fact gay," manifested no concrete, expressed desire to commit homosexual acts, and therefore his discharge on the basis of that statement alone could not stand.

Lt. Watson contends that the military's new "Don't Ask, Don't Tell" policy, codified at 10 U.S.C. § 654, suffers from the constitutional infirmities recognized in *Meinhold,* in that it presumes, without any rational basis, that servicemembers who merely state their homosexual orientation will engage in prohib-

towards plaintiff's objective, *i.e.,* to *remain* in the Navy, is consideration of his constitutional

claims." Plaintiff's Brief in Support of Summary Judgment at 19.

ited conduct. Watson notes that no such presumption attaches to statements of servicemembers who declare their heterosexual orientation. Although the presumption of homosexual conduct is rebuttable, plaintiff contends that it is virtually impossible for servicemembers to rebut that presumption without explicitly retracting their statements and repudiating their own sexual identity.

Watson argues that because the express language of the statute offends *Meinhold,* the new policy is unconstitutional on its face and must be struck down. Plaintiff's claims of facial invalidity are based on § 654(b)(2) of the policy, which provides for separation from service where:

> the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

Plaintiff contends that this language permits discharge based solely on statements of sexual orientation, which is constitutionally suspect under *Meinhold,* 34 F.3d at 1478, and no other redeeming construction of the policy is possible.

 Courts are obligated to consider nonconstitutional claims and avenues for relief prior to considering constitutional claims. *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985). In addition, with limited exceptions, facial challenges to statutes must be rejected unless there exists no set of circumstances in which the statute can constitutionally be applied.[4] *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to

challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). A corollary rule is that constitutional rights are personal and may not be asserted vicariously. These principles reflect "the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Id.,* 413 U.S. at 610–611, 93 S.Ct. at 2915. In accordance with these principles, this Court must consider whether there is some construction of the statute embodying the "Don't Ask, Don't Tell" policy that is constitutional. *Meinhold,* 34 F.3d at 1476–79.

 Under the statute, a servicemember's statement "that he or she is a homosexual or bisexual, or words to that effect," triggers a presumption that he or she engages in or has the intent or propensity to engage in prohibited homosexual conduct. The words "homosexual" and "bisexual," however, are defined terms. "Homosexual" is defined as "a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms 'gay' and 'lesbian'." 10 U.S.C. § 654(f)(1). "Bisexual" is defined as "a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual and heterosexual acts." 10 U.S.C. § 654(f)(2). As evident from their definitions, the words "homosexual" and "bisexual" as used in the statute connote homosexual conduct or a propensity to engage in proscribed homosexual conduct.

The DOD Directive similarly requires that the servicemember's statement concerning homosexuality be tied to prohibited conduct or an intent to engage in such conduct. The DOD Directive provides that a servicemember's statement that he or she "is a homosex-

---

4. The Supreme Court described these limited exceptions in *Broadrick v. Oklahoma,* 413 U.S. 601, 611–612, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973). One exception is a facial challenge based on First Amendment free-speech grounds. The Supreme Court has applied to

statutes restricting speech the "overbreadth doctrine," which renders a statute invalid in all its applications if it is invalid in any of them. Lt. Watson's challenge to the statute on First Amendment grounds is addressed separately.

ual or bisexual, or words to that effect," means "[l]anguage or behavior that a reasonable person would believe was intended to convey the statement that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts." DOD Directive at 1–2. Thus, under the Directive a statement cannot trigger discharge unless it demonstrates an intent or propensity to engage in prohibited homosexual conduct.

The statute and regulations also distinguish identifying oneself as "homosexual or bisexual, or words to that effect" from statements of "homosexual orientation." "Homosexual orientation" is defined in the DOD Directive as "[a]n abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts." Given these definitions, the statute and regulations can be reasonably construed as reaching only statements manifesting "a concrete, expressed desire to commit homosexual acts," *Meinhold*, 34 F.3d at 1479, not statements of homosexual orientation or status alone.

Plaintiff reads the statute as explicitly providing that the mere statement, "I am homosexual" or "I am gay" triggers discharge, which would be constitutionally impermissible under *Meinhold*. While this is one possible construction of the statute, it ignores the definitional sections and regulations, which make actionable only statements, language or acts demonstrating an intent or propensity to engage in prohibited homosexual conduct. Given the definitions in the statute and regulations, § 654(b)(2)'s reference to statements that "he or she is homosexual or bisexual" can refer only to statements manifesting an intent or propensity to engage in prohibited conduct. Under this construction, the presumption would not arise from mere statements of *orientation*, such as "I have a homosexual orientation." Thus, the statute may be construed in a constitutional manner

and is facially valid. To the extent the Government has initiated discharge proceedings on the basis of more problematic statements such as "I am homosexual," the proper challenge is on an as-applied, rather than a facial, basis.[5]

■ The question still remains whether the statute was constitutionally applied to Lt. Watson. The Ninth Circuit has held that the military may constitutionally discharge members for homosexual conduct, as distinguished from mere status or orientation:

> On the merits, we defer to the Navy's judgment that the presence of persons who engage in homosexual conduct, *or who demonstrate a propensity to engage in homosexual conduct by their statements,* impairs the accomplishment of the military mission.

*Meinhold*, 34 F.3d at 1472 (emphasis added). The *Meinhold* court held that a service person's *statements* would justify discharge if such statements showed a concrete, expressed desire or intent to commit homosexual acts. *Id.* Because homosexual conduct may constitutionally be prohibited, administrative discharges based on propensity or intent to engage in homosexual acts, as evidenced by the servicemembers' statements, do not violate equal protection. *Id.; see also Philips v. Perry,* 883 F.Supp. 539, 545–46 (W.D.Wash.1995).

■ In arguing that his discharge was unconstitutional, plaintiff focuses on his initial statement that he has a "homosexual orientation," and argues that under *Meinhold* that statement alone cannot constitutionally create a presumption of homosexual conduct. That is true. However, Watson's statement was not limited to a declaration of his homosexual orientation. Plaintiff's complete statement was "I have a homosexual orientation. I do not intend to rebut the presumption." While the first sentence can-

---

5. Whether it would be constitutionally proper in a particular case to initiate discharge proceedings based on such a statement would depend on whether the speaker is acknowledging that he or she is "homosexual" as that term is defined by the statute or rather merely expressing his or her orientation. A reasonable constitutional construction of the statute would not permit the

presumption to be created by the statement, "I am homosexual" alone unless it was clear that the speaker was defining himself or herself in accordance with the statutory definition or otherwise manifesting an intent to engage in homosexual acts. The Court need not reach that issue here because Watson's as-applied challenge is limited to his own statements.

not under the statute or regulations, as constitutionally construed, be sufficient to raise the presumption, the second sentence could reasonably be interpreted by the Navy as a statement regarding conduct. Watson's statement that he does not intend to "rebut the presumption" can only refer to the presumption in the statute that "the officer engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Thus, the Navy could reasonably interpret Watson's statement that he would not rebut the presumption as a statement that the presumption is properly applied to him.

Watson argues that the second sentence of his statement should be given no effect because, among other reasons, it could also be reasonably interpreted as a statement that he did not want his private life scrutinized and therefore would refuse to discuss any personal sexual matters. Watson is correct that his statement is susceptible to that interpretation. However, the appropriate question is whether it was reasonable and rational for the Navy to interpret the statement otherwise. The Court concludes that it was.

Watson also argues that because he merely acknowledged his homosexual "orientation," and it is unconstitutional to attach a presumption of conduct to such a statement, Watson's statement that he would not rebut the presumption is ineffective. Watson's use of the term "orientation" cannot shield him, however, from the effects of making further statements he was not compelled to make. Watson's statement that he would not rebut the presumption could reasonably be understood as a statement that the presumption was properly applied to him. This additional comment puts him on a different footing than if he had limited his statement to orientation alone.

■ Even if Watson's first statement was read as a mere acknowledgment of orientation, which could not under *Meinhold* constitutionally trigger the presumption of conduct, his later statement to the Board of Review in which he denied having engaged in any homosexual conduct with any military student or servicemember, and denied engaging in any homosexual conduct during the performance of military duty or while on any military installation, was sufficient to create a presumption that he has engaged in or has an intent to engage in homosexual conduct with non-servicemembers while off base and off duty. Such conduct may be constitutionally prohibited, is expressly proscribed by the regulations, and provides sufficient grounds for separation.

■ It is well recognized that adverse inferences may properly be drawn from silence by parties in civil cases. *Baxter v. Palmigiano,* 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("[f]ailure to contest an assertion ... is considered evidence of acquiescence ... if it would have been natural under the circumstances to object to the assertion in question"). The case most frequently cited for this principle is *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 55–56, 68 L.Ed. 221, 224 (1923), an immigration case, in which Justice Brandeis stated, "Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character." The Court went on to state:

> Conduct is often capable of several interpretations, and caution should be exercised in drawing inferences from it. But there is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak. Deportation proceedings are civil in their nature.

*Id.; accord, I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1043–44, 104 S.Ct. 3479, 3485–86, 82 L.Ed.2d 778, 789 (1984). The plaintiff contends that *Bilokumsky* is inapplicable here because it is an immigration case, but the principle has been applied in other civil contexts. *See, e.g., Daniels v. Pipefitters' Assn. Local Union No. 597,* 983 F.2d 800, 802 (7th Cir.1993) (an adverse inference could have been drawn from the invocation of the Fifth Amendment in a civil case involving racial discrimination); *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 158 (1st Cir.1990) (human resource manager's refusal to give employee any reason for termi-

nation, other than stating he did not wish to discuss things she already knew, was evidence of the Company's discriminatory animus toward pregnant employee).

 Because the Navy could properly draw an adverse inference from Watson's selective omission of any reference to off base, off duty conduct with non-military personnel, there is no basis for finding the statute was unconstitutionally applied to him.[6] He was not discharged solely for acknowledging his sexual orientation, but rather for making statements manifesting an intent or propensity to engage in proscribed homosexual conduct.

### V. Due Process

Watson contends that his discharge based on statements concerning his homosexual orientation violates his right to substantive due process under the Fifth Amendment. Watson argues that the government's goal of force readiness is not rationally related to "a policy that systematically discharges servicemembers *regardless of their contribution to force readiness.*" Plaintiff's Opening Brief at 38 (emphasis in original).

 The due process clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. The due process clause "contains a substantive component, sometimes referred to as 'substantive due process,' which bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them.'" *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 677, 677, 88 L.Ed.2d 662, 672 (1986) (Stevens, J., concurring). The substantive due process clause "serves to prevent governmental power from being 'used for purposes of oppression.'" *Id.* at 331, 106 S.Ct. at 665, 88 L.Ed.2d at 668 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 277, 15 L.Ed. 372 (1856)). Although courts approach

equal protection and due process analyses differently, there are similarities in the doctrines:

> When conduct, either by virtue of its inadequate foundation in the continuing traditions of our society or for some other reason, such as lack of connection with interests recognized as private and protected, is subject to some government regulation, then analysis under the substantive due process clause proceeds in much the same way as analysis under the lowest tier of equal protection scrutiny. A rational relation to a legitimate government interest will normally suffice to uphold the regulation. At the other extreme, where the government seriously intrudes into matters which lie at the core of interests which deserve due process protection, then the compelling state interest test employed in equal protection cases may be used by the Court to describe the appropriate due process analysis.

*Beller,* 632 F.2d at 808 (citing *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)). Thus, when a classification penalizes the exercise of a fundamental constitutional right, heightened scrutiny is required. *Reno v. Flores,* 507 U.S. 292, 301–03, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993); *High Tech Gays,* 895 F.2d at 572. On the other hand, where a regulation impairs a lesser interest, there need only be a rational relationship between the challenged regulation and a legitimate governmental purpose. *Flores,* 123 L.Ed.2d at 18. Because the Supreme Court has held that there is no fundamental right to engage in homosexual conduct, *Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, the policy must be upheld if there is a rational relationship between the policy and a legitimate governmental purpose.

---

**6.** Even where presumptions of one fact from evidence of another are codified in civil statutes, such presumptions are upheld where "there is some rational connection between the fact proved and the ultimate fact presumed," and the inference of one fact from proof of another is not

"so unreasonable as to be a purely arbitrary mandate." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976). There is no basis for finding that the inference drawn by the Navy from Watson's statement was unreasonable or arbitrary.

■] Plaintiff's substantive due process claim rises and falls with his equal protection claim because they both require a rational relationship between the policy and the government's interest. Under *Meinhold*, discharge for homosexual conduct or for statements evidencing an intent or propensity to engage in homosexual conduct is constitutionally permissible. As a result, plaintiff's substantive due process claim must be rejected for the same reasons his equal protection claim fails.

## VI. *First Amendment*

Watson contends that the policy and regulations violate his rights of freedom of speech and association as guaranteed him by the First Amendment, both on its face and as applied to him in particular. The plaintiff claims that the policy infringes on the First Amendment because it is a content-based restriction on speech. He further argues that because the "Don't Ask, Don't Tell" policy is explicitly aimed at silencing certain kinds of speech, it is presumptively invalid and the government has a much higher burden to justify this policy under the First Amendment than it did to justify the former policy at issue in *Pruitt*, which was found not to violate the First Amendment.

■ Lt. Watson all but ignores that First Amendment challenges of military regulations are subject to a different analysis than those brought in a civilian context. "The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507, 106 S.Ct. at 1313.

While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy*, 417 U.S. 733, 758, 94 S.Ct. 2547, 2551, 41 L.Ed.2d 439, 459 (1974). Thus, "[judicial] review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman*, 475 U.S. at 508, 106 S.Ct. at 1313.

■ Applying principles of military deference, the Supreme Court has upheld an Air Force regulation that precluded an Orthodox Jew and ordained rabbi from wearing a yarmulke ("the First Amendment does not require the military to accommodate such practices in the face of its view that they would detract from the uniformity sought by the dress regulations"); *Goldman*, 475 U.S. 503, 106 S.Ct. at 1310; upheld articles of the Uniform Code of Military Justice punishing an Army officer for making public statements urging African–American servicemembers not to go to Viet Nam if ordered to do so; *Parker*, 417 U.S. 733, 94 S.Ct. 2547; and upheld United States Air Force regulations requiring servicemembers to obtain approval from their commanders before circulating petitions to Members of Congress; *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). The lesson of these cases is that the servicemember's interests in autonomy, self-identity, and political expression are subordinate to the interest of the military in good order and discipline, morale, unit cohesion, and combat readiness.

■ The military's "Don't Ask, Don't Tell" policy is not facially invalid on First Amendment grounds. There is no question that the policy affects speech and inhibits speech to a limited extent. But the policy does not seek to punish speech itself but rather uses speech as evidence of intent or propensity to engage in conduct that the military may constitutionally prohibit. As a result, the policy affects speech "only incidentally, in the course of pursuing other legitimate goals." *Ben–Shalom v. Marsh*, 881 F.2d 454, 462 (7th Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). *See also Richenberg*, 909 F.Supp. at 1310.

■ The Ninth Circuit has consistently held that military regulations requiring discharge of servicemembers who merely state their homosexuality do not implicate First Amendment concerns. Courts have reasoned that the servicemember is not being discharged for his or her speech, but rather for his or her status as a homosexual. *See Pruitt*, 963 F.2d at 1163–64; *Schowengerdt v. United States*, 944 F.2d 483, 489 (9th Cir. 1991), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992). *See also Philips*, 883 F.Supp. at 547. Admissions of homosexuality, "like most admissions, [are] made in speech, but that does not mean that the first amendment precludes the use of the admission as evidence of the facts admitted." *Pruitt*, 963 F.2d at 1164.

■ The Navy's use of Watson's statements does not violate the First Amendment. While the government may not rely on information that would impinge on First Amendment rights if there is no connection between the information sought and the government's interest, *Dawson v. Delaware*, 503 U.S. 159, 167, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992), where such a connection does exist, the information may be used even though communicated by speech or expressive activity. The Supreme Court recently held in the criminal context that "[t]he First Amendment … does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993). As the district court in *Thomasson v. Perry*, 895 F.Supp. 820, 824 (E.D.Va. 1995), noted, if this holds true in the criminal context, it is certainly applicable in the civil context, where the litigant is not afforded the same constitutional protections as a criminal defendant. Here, the Navy reasonably construed Watson's statements as demonstrating a propensity or intent to commit prohibited homosexual acts. As a result, his discharge was based on evidence of conduct, not speech, and the First Amendment is not implicated.

### Conclusion

Because the Navy could properly infer from Watson's statements that he had engaged in or had an intent or propensity to engage in homosexual conduct, his constitutional rights were not violated by his discharge from military service.

IT IS SO ORDERED.