Filed 12/16/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO POLICE DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEOFFREY S.,<br><br>    Defendant and Appellant. | D077999<br><br><br><br> (Super. Ct. No. 37-2020-<br>00014589-CU-PT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Judy S. Bae, Judge.  Affirmed.

Geoffrey S., in pro. per., for Defendant and Appellant.

Mara W. Elliott, City Attorney, John C. Hemmerling, Assistant City Attorney, and Nicole R. Crosby, Deputy City Attorney for Plaintiff and Respondent.

In *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550 (*Kaiser*), we held that hearsay evidence is admissible at a hearing on a workplace violence restraining order (WVRO).  (Code Civ. Proc., § 527.8.) Other courts have reached the same conclusion for a hearing on a civil harassment restraining order (CHRO).  (Code Civ. Proc., § 527.6; see

*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 728–729 (*Duronslet*); *Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 521 (*Yost*).)

We must now decide the same question for a hearing on a gun violence restraining order (GVRO) under Penal Code section 18175.[1] We hold that hearsay evidence is likewise admissible at a GVRO hearing. We further conclude that the evidence submitted to the trial court was sufficient to establish by clear and convincing evidence that appellant Geoffrey S. posed a significant danger of causing personal injury by gun violence.[2] (§ 18175, subd. (b)(1).) Because we reject Geoffrey's other claims, we affirm the one-year GVRO issued against him.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *GVRO Petition and Attachments*

On April 22, 2020, the San Diego Police Department (Department) filed a GVRO petition against Geoffrey with an attached declaration and four redacted police reports. The attached declaration of Detective Justin Garlow stated: "Based on the content of the attached reports, I hold the opinion that a GVRO is necessary to protect the public and prevent harm to the respondent or others. There are no less restrictive means to ensure public safety."

The redacted police reports described several police contacts with Geoffrey between April 13 and 17 of 2020. On April 13, an "anonymous clinical psychologist" requested a welfare check on Geoffrey "due to him having 'been posting angrily on Facebook about buying ammo and to "protect"

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Geoffrey's first name and last initial are used in this opinion in accordance with California Rules of Court, rule 8.90(b)(3) and (b)(11).

himself.' " The police contacted Geoffrey and "determined he did not meet criteria at the time, but notated [*sic*] he 'has very eccentric beliefs about the government and was dillusional [*sic*] and very paranoid.' "

Just before midnight on April 14 or 15, police responded to a disturbance call at Geoffrey's residence. They heard people arguing inside the house. When they knocked on the door, someone inside said, " 'Go away!' " The argument continued, then Geoffrey ran out the back door and reported to the police that someone inside had just threatened to kill him.

Geoffrey explained to the police that for several weeks, he had been posting on social media about his belief that philanthropist Bill Gates had murdered millions of people. In response, a stranger called him to express his agreement. When Geoffrey asked the person how he got his phone number, the person said it was given to him by God. As a religious person, Geoffrey then invited the person over to his house to talk about their beliefs. The person came over and spent the night. The next day, they talked all day and read Bible verses. The man eventually proclaimed that he was God, got a kitchen knife, and demanded that Geoffrey " 'kneel before him.' " After Geoffrey complied, the man said, " 'I am going to kill you motherfucker.' " The man also told Geoffrey he was a " 'west coast gangster' " and had "been shot and stabbed before."

Geoffrey told the police he had " 'hunting shotguns' " inside his house, but no ammunition. He began talking about his "conspiracy theories" and "distrust of the government." He explained "his eccentric beliefs about how he didn't believe the Corona virus was real, how Bill Gates is a murderer and he is trying to vaccinate everyone with 'nanotechnology' so they can be tracked by 5G towers" and "claimed he even called the FBI San Diego field office to report what he knew about Bill Gates . . . ."

3

The police confirmed that the other man was still inside Geoffrey's house and his car was parked in the driveway. The man refused to come out of the house. The police decided to leave without entering or trying to take the man into custody. Geoffrey became "upset and unreasonable" and called them " 'cowards.' "

On the afternoon of April 17, four officers and a clinician with the Psychiatric Emergency Response Team (PERT) were dispatched to Geoffrey's house in response to more calls about him "posting bizarre threatening statements on social media and attempting to purchase firearm ammunition." Before arriving at Geoffrey's house, the police tried to contact the reporting parties and also reviewed his Facebook posts. The names of the reporting parties were redacted from the police reports attached to the GVRO petition.

The first reporting party was anonymous and did not answer his phone. This anonymous person had reported that Geoffrey said, " 'I guess I'm just going to have to take things into my own hands.' "

The police were able to contact the second reporting party. This person "expressed a strong concern for Geoffrey's mental health" and said, "Geoffrey has reported signs of anxiety and paranoia for some time but has refused to seek treatment." According to this person, "Geoffrey's anxiety, delusional thoughts and paranoia ha[ve] rapidly escalated, putting him in a panic state." Geoffrey had expressed to this person "a strong need to defend himself with his firearms against a government takeover." Earlier that morning, Geoffrey had called "in rage, ranting about Walmart refusing to sell him firearm ammunition due to him coming up in their system as 'denied.' " Geoffrey stated it was part of the " 'government[']s plan.' " He told this person, " 'People are going to try and get me and I need to defend myself.' " Geoffrey

4

said he had asked his father to fly to California from Ohio to purchase ammunition for him, but his father declined.

The police discovered that Geoffrey had posted on Facebook multiple times per day over the previous month. None of these Facebooks posts were attached to the GVRO petition or submitted to the court. One of the police reports described them as follows: "The post[s] were essentially attempts to gather followers into defending themselves against a government takeover. Geoffrey believed that new 5G cell towers and vaccines were being implemented to control Americans. Geoffrey was outlining his attempts to stock up on ammunition and encouraging others to do the same."

When the police contacted Geoffrey, he refused to allow them to enter his home, but agreed to talk to them outside. He sat on a retaining wall next to his driveway. The police informed him that "his friends and family asked the police to check on him due to comments he had posted on social media regarding the purchase of ammunition."

According to the police reports, "Geoffrey was very animated, agitated and was rambling about a government takeover." He "believed Bill Gates and the government were using the COVID-19 to scare Americans into receiving a vaccine to infuse trackers" and that "5G cell towers being installed would be used to track everyone with the vaccine." "Geoffrey would not answer specific questions but would instead go into lengthy rants about various unrelated topics." He "was exhibiting psychotic and delusional behavior." "When asked specifically about his quest for ammunitions and his intentions, Geoffrey replied that it was none of our business and quoted his 1st and 2nd amendment rights. Geoffrey became paranoid about where we had received our information and accused us of working with FBI to tap his phone lines. Geoffrey did confirm that he owns several shotguns." "Geoffrey

5

was aggressive in nature and very confrontational, answering most of our questions with questions and stating we were all stupid. At one point, Geoffrey stood up and began screaming at the top of his lungs, 'I'm buying ammo and you should too!' "

The police and PERT clinician believed that "Geoffrey was a potential danger to others" and decided to place him on a 72-hour psychiatric hold under Welfare and Institutions Code section 5150. Geoffrey resisted being taken into custody and began yelling for neighbors to help him. He continuously yelled obscenities at the police while being transported to the hospital.

B.    *GVRO Hearing and Defense Evidence*

The trial court issued a temporary GVRO on April 22, 2020.[3] The court held a GVRO hearing on July 21, 2020. Both sides were represented by counsel, but the hearing was unreported.[4] Geoffrey and his counsel appeared

---

[3]    We augment the record to include the temporary GVRO on our own motion. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

[4]    The trial court later approved a lengthy settled statement that was prepared by Geoffrey in propria persona. The defense exhibits Geoffrey submitted at the hearing were attached to the settled statement. We will consider the attached Exhibits A-F as part of the record on appeal. But because the trial court heard no testimony at the GVRO hearing, and the record on appeal now includes all the documentary and video evidence submitted by the parties below, we will otherwise consider the settled statement only to the extent it describes what occurred at the unreported hearing. It would not be proper for us to consider the settled statement to supplement the documentary and video evidence submitted below. (Cal. Rules of Court, rule 8.137(a) & (b)(1)(A) [permitting settled statement "as the record of the oral proceedings in the superior court, instead of a reporter's transcript" when the proceedings "were not reported by a court reporter"].) We also disregard attachments 2a and 2b to the settled statement, which do not purport to summarize what occurred at the GVRO hearing; they instead

remotely by video. No witnesses testified at the hearing, and the Department submitted no additional evidence beyond the previously submitted declaration of Detective Garlow and police reports attached to the GVRO petition. However, Geoffrey submitted six defense exhibits (Exhibits A-F). At Geoffrey's request, the court also reviewed police body-camera footage of the April 17 encounter outside his house. Geoffrey made hearsay objections to the witness statements and Facebook posts summarized in the police reports.

The defense exhibits included a psychiatric admission evaluation of Geoffrey and medication noncompliance summary, both prepared by Dr. Samuel Etchie at Alvarado Parkway Institute (Alvarado). The psychiatric admission evaluation (signed April 22, 2020) described Geoffrey's "delusional beliefs" and his admission to the hospital's psychiatric intensive care unit after Geoffrey's pastor and a friend had called 911 to express their concerns about his mental state and social media postings. Geoffrey repeated to Dr. Etchie his theories about Bill Gates and the COVID-19 vaccine. He said: "They have this vaccine and if they are going to force us to take this vaccine then I need to buy ammo and ammunitions to defend myself against the government and protect my family . . . ." Geoffrey also told Dr. Etchie that his pastor, a friend, and his father all "told lies against [him]."

Dr. Etchie stated: "Upon arrival at this facility . . . , the patient remained with significant risk of danger to others as a result of well-developed and well-organized delusional thought processes about the government and various governmental agencies . . . and the philanthropist, Bill Gates, and the current COVID-19 vaccine that is not even available at

---

include 14 pages of argumentative responses to questions about the issues Geoffrey intended to raise on appeal.

7

this time." "Inpatient psychiatric admission is imperative at this time due to the imminent risk of harm to others and the patient's ability and wherewithal to purchase arms and ammunitions and to prevent harm to the patient and to others." "The patient . . . remains with significant risk of harm to others, especially, 'people from the government and people connected with the Bill Gates vaccine and the FBI.'" Dr. Etchie diagnosed Geoffrey with "[b]ipolar affective disorder, mania, severe with psychotic features."

In the medication noncompliance summary (signed May 4, 2020), Dr. Etchie quoted Geoffrey as follows: "Everybody's against me - my deacon, my pastor, my father, my friend, the police, yourself, the nurses and staff in this hospital because of only one reason. I want to defend my Second Amendment rights to defend myself because of all the crazy things that have been started and have been sponsored by Bill and Melinda Gates Foundation to infect millions of Americans with bad vaccine in the name of treating this viral pandemic." Geoffrey denied any mental illness and refused to take any medication.

Another defense exhibit was a one-page order of May 4, 2020 issued by a hearing officer after a certification review hearing (Welf. & Inst. Code, § 5256.1) held at Alvarado regarding Geoffrey's involuntary psychiatric commitment.[5] The order noted that Geoffrey had previously been certified on April 20, 2020 as "a danger to others." However, the hearing officer concluded that Geoffrey did not have a mental disorder and explained: "No

---

[5] Under the Welfare and Institutions Code, a certification review hearing officer may be "either a state qualified administrative law hearing officer, a physician and surgeon, a licensed psychologist, a registered nurse, a lawyer, a certified law student, a licensed clinical social worker, a licensed marriage and family therapist, or a licensed professional clinical counselor." (Welf. & Inst. Code, § 5256.1.)

known history of diagnosis or treatment. [Geoffrey] with belief virus is created by Bill Gates Foundation and others to place tracking device in others. [Geoffrey] has sought to obtain ammo to protect himself. No meds taken. No threats since admit. Strange beliefs insufficient to support psychiatric illness." Accordingly, the hearing officer found that Geoffrey could no longer be detained.

Geoffrey also submitted exhibits showing that he was a licensed attorney in Ohio and a licensed real estate broker in California.

Geffrey's father submitted a declaration stating: "On about April 17, 2020 I received a telephone call from a female (I don't recall her name) who represented that she was with the San Diego Police Department. She asked if my son, Geoffrey, had attempted to buy ammunition. I answered yes. She asked if he had said why he needed ammunition. I answered that I thought he wanted to be prepared to defend himself and his family against an intrusion."

The body-camera video from April 17, 2020 showed the interaction between Geoffrey and the police in front of his house. In addition to what was described in the police reports, Geoffrey said on the video that he did not intend to hurt himself or anyone else. When asked, he did not deny that he had been posting on Facebook about purchasing ammunition for his guns. He explained that he had been home alone for about 40 days and had been talking to a network of people through Facebook. He claimed that he had tried to buy ammunition for his guns because supply chains were breaking down in the pandemic and he feared he would have to hunt for food. According to Geoffrey, the "virus" (which he put in air quotes) was in fact a "bioweapon" that was released from Wuhan, China. Even though he was asked multiple times, Geoffrey repeatedly evaded answering the question

9

whether he had talked to anyone or posted anything online about buying ammunition because he needed to defend himself. After three minutes of dodging the question, he finally told the police, "My simple answer is, 'none of your business.' " When asked if he had a history of mental illness, Geoffrey said, "Absolutely not, I'm the smartest person you know."

Geoffrey also told the police about an "anti-Christ character" who appeared in the "end days" in the Book of Revelation and made everyone believe they could not leave home, travel, or buy or sell goods without the "mark of the beast." He said Bill Gates's plan was that people could not leave home or buy or sell goods unless they got "the mark" of the vaccine. He claimed that Bill Gates was developing the COVID-19 vaccine with "nanoparticle technology" that could track people and detect the balances in their bank accounts using 5G cell towers. According to Geoffrey, Nazi scientists had been brought to the United States from Germany to develop the atomic bomb in "Operation Paperclip," and in 2018, the operation was moved to Wuhan, China to develop bioweapons with Bill Gates in charge. Geoffrey believed that Bill Gates "has the spirit of the anti-Christ in him."

C. *GVRO After Hearing*

After reviewing the documentary evidence and body-camera video footage, the trial court granted a GVRO prohibiting Geoffrey from owning or possessing firearms or ammunition for one year. The court issued the GVRO using Judicial Council Form GV-120 and found "by clear and convincing evidence" that Geoffrey posed "a significant danger of causing personal injury" by gun violence and that a GVRO was "necessary to prevent personal injury . . . ."

10

Geoffrey appeals from the one-year GVRO.[6]

DISCUSSION

I

We first consider whether the appeal is moot. The GVRO expired in July 2021 and the Department did not seek to renew it. After the opening brief was filed in September 2021, the Department moved to dismiss the appeal on mootness grounds. We deferred ruling on the motion and now deny it.

Ordinarily, an appeal from an expired restraining order is moot because the appellate court cannot grant any effective relief from an expired order. (See *Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 144.) But here, Geoffrey asserts that as a result of the restraining order, he faces an investigation by the Ohio State Bar where he is currently licensed and in good standing. He

---

[6] Geoffrey's request for judicial notice is granted in part and denied in part. The court takes judicial notice of Exhibit A to his motion, a superior court order. (Evid. Code, § 452, subd. (d) [court records].) The request for judicial notice of motion exhibits B (Rice University report); C (Mastercard document); D (journal article); and E (declaration) is denied because those documents are not properly subject to judicial notice under Evidence Code sections 451 and/or 452. The Department's request for judicial notice of Exhibit A to its motion to dismiss the appeal is denied as moot because we have already augmented the record on our own motion to include the complete GVRO petition and exhibits. We also decline to consider the August 9, 2022 psychological evaluation attached as Exhibit A to Geoffrey's supplemental letter brief filed October 14, 2022. We did not permit the parties to submit additional evidence in our orders allowing supplemental briefing, and this exhibit post-dates the trial court's GVRO by over two years. "In reviewing the trial court's ruling, we must consider the facts before the court *at the time of its ruling*, and not by reference to evidence produced at a later date." (*Sacramento Area Flood Control Agency v. Dhaliwal* (2015) 236 Cal.App.4th 1315, 1328, fn. 5.)

11

also contends that he will now be listed in a database alerting law enforcement he is a potential threat.

An appeal from an expired restraining order is not moot if it could have collateral consequences in future proceedings. (See, e.g., *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 209 [appeal not moot where expired restraining order "could have consequences . . . in this and future court proceedings"]; see also *People v. Ellison* (2003) 111 Cal.App.4th 1360, 1368–1369 ["[a] criminal case should not be considered moot where a defendant has completed a sentence where, as here, the sentence may have 'disadvantageous collateral consequences' "].)

Moreover, as this case illustrates, a one-year GVRO may also evade appellate review by expiring before the appeal is decided. "That a controversy may be so short-lived as to evade normal appellate review is a strong reason to decide an issue although it is technically moot." (*In re Schuster* (2019) 42 Cal.App.5th 943, 952.)

Finally, an appellate court may exercise its discretion to hear a moot case where it presents an issue of broad public interest that is likely to recur. (See *Golden Door Properties, LLC v. Superior Court of San Diego County* (2020) 53 Cal.App.5th 733, 760.) We conclude that the general admissibility of hearsay evidence in a noticed hearing on a GVRO petition to prevent gun violence is such an issue.

Accordingly, for all these reasons, the Department's motion to dismiss the appeal as moot is denied.[7]

---

[7] On the mootness issue, we note that Geoffrey may be subject to a separate five-year prohibition against owning or possessing a firearm as a result of his involuntary psychiatric detention. Under the Welfare and Institutions Code, someone who was taken into custody for a section 5150 hold, assessed within the meaning of section 5151, and admitted to a

12

## II

The only evidence the Department submitted in support of the GVRO petition was the attached declaration of Detective Garlow and hearsay police reports. The Department submitted no additional evidence at the GVRO hearing. On appeal, Geoffrey argues that hearsay evidence is inadmissible in a GVRO hearing under section 18175. This is an issue of statutory interpretation subject to de novo review. (See *Walker v. Superior Court* (2021) 12 Cal.5th 177, 194–195.)

A.   *The GVRO Statute*

The GVRO statute provides for three different types of protective orders prohibiting a person from owning or possessing a firearm, ammunition, or magazine: (1) a 21-day temporary emergency GVRO issued ex parte on request of a law enforcement officer if the court finds "reasonable cause to believe" the subject "poses an immediate and present danger" of gun violence (§ 18125); (2) a 21-day ex parte GVRO issued on request of a family member, employer, coworker, teacher, or law enforcement officer if the court finds a "substantial likelihood" that the respondent "poses a significant danger, in the near future" of gun violence (§ 18150, 18155); and (3) a one to five year GVRO issued after notice and hearing if the court finds "by clear

---

designated facility within the meaning of sections 5151 and 5152, is prohibited from owning or possessing any firearm for five years after release. (Welf. & Inst. Code, § 8103, subd. (f)(1)(A).) A violation is punishable by imprisonment in state prison or county jail. (*Id.* at subd. (i).) On this record, however, we cannot determine definitively whether Geoffrey is subject to this prohibition.

and convincing evidence" that there is a "significant danger" of gun violence (§ 18175).[8]

For a temporary emergency GVRO, the law enforcement officer may request the order orally, but must later provide a sworn declaration reciting the oral statements made to the court. (§ 18140, subd. (a).) The court may issue a temporary emergency GVRO based on statements of the law enforcement officer. (§ 18145, subd. (a)(1).) If time and circumstances permit, a temporary emergency GVRO may be obtained in writing based on a sworn declaration. (*Id*. at subd. (a)(2).) A designated judge, commissioner, or referee must be reasonably available to issue temporary emergency GVROs even when the court is not in session. (*Id*. at subd. (b).)

For an ex parte GVRO, the court must either examine the petitioner and any witness under oath or require the petitioner and any witness to submit sworn affidavits. (§ 18155, subd. (a)(1)-(2).) The court may issue an ex parte GVRO if the sworn affidavits or testimony and "any additional information provided to the court" satisfy the "substantial likelihood" standard. (§ 18150, subd. (b).) The statute provides that the court "shall consider all evidence" of six factors listed in section 18155, subdivision (b)(1),[9]

---

[8]   At the time of the hearing in this case, a GVRO after hearing could have at most a one-year duration. (§ 18170, former subd. (a).) Effective September 1, 2020, the statute was amended to provide a duration of one to five years. (§ 18170, subd. (a)(1); Stats. 2019, ch. 725, § 4.5.)

[9]   The subdivision (b)(1) factors are: "(A) A recent threat of violence or act of violence by the subject of the petition directed toward another. [¶] (B) A recent threat of violence or act of violence by the subject of the petition directed toward himself or herself. [¶] (C) A violation of an emergency protective order issued pursuant to [other specified provisions of law]. [¶] (D) A recent violation of an unexpired protective order issued pursuant to [other specified provisions of law]. [¶] (E) A conviction for any offense listed

14

and "may consider any other evidence of an increased risk for violence, including, but not limited to" seven additional factors listed in section 18155, subdivision (b)(2).[10] An ex parte GVRO must be issued or denied on the same day the petition is filed or the next day of judicial business. (§ 18150, subd. (d).)

For a GVRO after notice and hearing, the hearing must be held within 21 days of issuance of the temporary emergency GVRO or ex parte GVRO.[11]

---

in Section 29805 [illegal firearm possession]. [¶] (F) A pattern of violent acts or violent threats within the past 12 months, including, but not limited to, threats of violence or acts of violence by the subject of the petition directed toward himself, herself, or another." (§ 18155, subd. (b)(1)(A)-(F).) "Recent" is defined to mean "within the six months prior to the date the petition was filed." (§ 18155, subd. (b)(3).)

[10] The subdivision (b)(2) factors are: "(A) The unlawful and reckless use, display, or brandishing of a firearm by the subject of the petition. [¶] (B) The history of use, attempted use, or threatened use of physical force by the subject of the petition against another person. [¶] (C) A prior arrest of the subject of the petition for a felony offense. [¶] (D) A history of a violation by the subject of the petition of an emergency protective order issued pursuant to [specified provisions] of the Family Code. [¶] (E) A history of a violation of the petition of a protective order issued pursuant to [other specified provisions of law]. [¶] (F) Documentary evidence, including, but not limited to, police reports and records of convictions, of either recent criminal offenses by the subject of the petition that involve controlled substances or alcohol or ongoing abuse of controlled substances or alcohol . . . . [¶] (G) Evidence of recent acquisition of firearms, ammunition, or other deadly weapons." (§ 18155, subd. (b)(2)(A)-(G).)

[11] Rule 8 of the Judicial Council's Emergency Rules Related to COVID-19 provided that any temporary GVRO issued or set to expire during the COVID-19 state of emergency "must remain in effect for a period of time that the court determines is sufficient to allow for a hearing on the long-term order to occur, for up to 90 days." (Cal. Rules of Court, Appen. I, rule 8.) In this case, the temporary GVRO was issued during the COVID-19 state of

(§§ 18148, 18165.) The statutory provision for a GVRO after hearing refers back to the factors listed for an ex parte GVRO. Specifically, section 18175 provides: "In determining whether to issue a gun violence restraining order [after notice and hearing], the court *shall consider evidence* of the facts identified in paragraph (1) of subdivision (b) of Section 18155 *and may consider any other evidence of an increased risk for violence*, including, but not limited to, evidence of the facts identified in paragraph (2) of subdivision (b) of Section 18155." (§ 18175, subd. (a), italics added.)

B.     *The Kaiser Decision*

In *Kaiser, supra*, 201 Cal.App.4th 550, we ruled that hearsay evidence is admissible at a hearing on a WVRO. The WVRO statute allows an employer to seek on behalf of one of its employees (1) a temporary restraining order for up to 21 days (which may be extended to 25 days), and (2) an order after notice and hearing of not more than three years prohibiting unlawful violence or threats of violence against the employee. (Code Civ. Proc., § 527.8, subds. (a), (e)-(k).)

The WVRO statute states that a temporary restraining order shall be issued based solely on the employer's declaration providing "reasonable proof" that its employee has suffered unlawful violence or a credible threat of violence by the respondent, and that great or irreparable harm would result to the employee. (Code Civ. Proc., § 527.8, subd. (e).) After granting or denying such a temporary restraining order, the court must hold a "hearing" before issuing a long-term WVRO. (*Id*. at subds. (h)-(i).) The hearing must be held within 21 days of the ruling on the temporary restraining order, or within 25 days if there is good cause. (*Id*. at subd. (h).) Subdivision (j) states:

---

emergency for a 90-day period expiring on July 21, 2020, the date of the noticed GVRO hearing.

"At the hearing, the judge shall receive any testimony that is relevant and may make an independent inquiry." If the court finds "by clear and convincing evidence" that the respondent engaged in unlawful violence or made a credible threat of violence, it must issue a WVRO of not more than three years. (*Id*. at subd. (j).)

As we noted in *Kaiser*, these provisions of the WVRO statute are similar to provisions of the statute governing CHROs. (Code Civ. Proc., § 527.6.) Section 527.6 allows a victim of harassment to seek (1) a temporary CHRO for up to 21 days (which may be extended to 25 days) based solely on the victim's declaration showing "reasonable proof" of harassment (Code Civ. Proc., § 527.6, subds. (d), (f)), and (2) a long-term CHRO of up to five years issued based on "clear and convincing evidence" of harassment after a hearing at which "the judge shall receive any testimony that is relevant, and may make an independent inquiry." (*Id*. at subd. (i).) Like Code of Civil Procedure section 527.8, section 527.6 requires a showing of "great or irreparable harm" for a temporary CHRO, but not for a CHRO after hearing. (Code Civ. Proc., § 527.6, subds. (d), (i).)

The appellant in *Kaiser* was appealing a three-year WVRO issued on behalf of two Kaiser employees after a hearing. He argued that the trial court had erred by admitting hearsay evidence of his threats at the WVRO hearing, including hearsay testimony from one of the employees that a police officer had told her that appellant's wife had reported to the police that appellant was going to shoot the employee. (*Kaiser*, *supra*, 201 Cal.App.4th at pp. 554–555.) We concluded that hearsay evidence is admissible at a WVRO hearing for several reasons. (*Id*. at pp. 555–558.)

First, we noted that Code of Civil Procedure section 527.8, subdivision (j) (then subdivision (f)) of the statute specifically states that the court "shall

17

receive *any testimony that is relevant*" at the hearing. (Code Civ. Proc., § 527.8, subd. (j), italics added.) We explained: "The plain language of this provision suggests that the Legislature intended to permit a trial court to consider *all* relevant evidence, including hearsay evidence, when deciding whether to issue an injunction to prevent workplace violence pursuant to [Code of Civil Procedure] section 527.8." (*Kaiser*, *supra*, 201 Cal.App.4th at p. 557.) "Evidence Code section 1200, subdivision (b) provides that hearsay evidence is generally inadmissible, '[e]xcept as provided by law.' Subdivision (f) [now subdivision (j)] of [Code of Civil Procedure] section 527.8 appears to be one of the exceptions to Evidence Code section 1200, subdivision (b), in that it mandates the court consider, without limitation, 'any testimony that is relevant.' " (*Ibid*.)

Second, we observed: "The unique context of a hearing pertaining to a workplace violence injunction supports our conclusion. Specifically, injunctive proceedings under [Code of Civil Procedure] section 527.8 are intended to parallel those under [Code of Civil Procedure] section 527.6, which are procedurally truncated, expedited, and intended to provide quick relief to victims of civil harassment." (*Kaiser*, *supra*, 201 Cal.App.4th at p. 557.)

Third, we explained: "In addition, a petition for an injunction under [Code of Civil Procedure] section 527.8 is heard by the court, not a jury, and is decided by the clear and convincing standard of proof. Trial judges are particularly aware of the potential unreliability of hearsay evidence, and are likely to keep this in mind when weighing all of the evidence presented." (*Kaiser*, *supra*, 201 Cal.App.4th at p. 557.)

We concluded: "Considering the fact that the purpose of the statute is to prevent violence in the workplace, the expedited nature of the proceeding

contemplated by the statute, and the Legislature's directive that the trial court shall receive all relevant testimony without qualification, we conclude that the testimony that a trial court may consider in making a ruling on a petition pursuant to [Code of Civil Procedure] section 527.8 is not limited to nonhearsay testimony." (*Kaiser*, *supra*, 201 Cal.App.4th at p. 558.)

Other courts have since cited *Kaiser* outside the WVRO context. For example, in *Duronslet*, *supra*, 203 Cal.App.4th 717, the court cited *Kaiser* in holding that hearsay evidence is admissible to prove a credible threat of violence for a three-year CHRO after hearing under Code of Civil Procedure section 527.6. (*Id*. at pp. 728–729.) The court thus found no error in the admission of a police report containing hearsay statements by a non-testifying nurse who told the police about threats she said she had heard the defendant make. (*Id*. at pp. 723, 728–729; accord *Yost*, *supra*, 51 Cal.App.5th at p. 521 [citing *Kaiser* and *Duronslet* for the proposition that "hearsay evidence, such as a declaration or police report, is admissible during hearings conducted pursuant to [Code of Civil Procedure] section 527.6"].) Another court has cited *Kaiser* in stating that hearsay evidence is admissible in a noticed hearing on a petition for restraining order under Welfare & Institutions Code section 213.5 and rule 5.630(f)(1) of the California Rules of Court. (*In re L.W.* (2020) 44 Cal.App.5th 44, 48, fn. 3.)

C.    *Admissibility of Hearsay Evidence at a GVRO Hearing*

We now conclude that the rationale of *Kaiser* also applies to a GVRO hearing under section 18175. Based on the language, purpose, and legislative history of the GVRO statute, and its similarity to the WVRO and CHRO statutes, we hold that hearsay evidence is admissible at a GVRO hearing.

19

We begin with the statutory language. By its terms, Penal Code section 18175, subdivision (a), states that the court "shall consider *evidence*" of the factors listed in section 18155, subdivision (b)(1), and "may consider *any other evidence* of an increased risk for violence," including the factors listed in section 18155, subdivision (b)(2). (Pen. Code, § 18175, subd. (a), italics added.) The Evidence Code defines hearsay as a form of "evidence." (Evid. Code, § 1200, subd. (a) [" 'Hearsay evidence' is *evidence* of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."], italics added.) Moreover, the ordinary meaning of the word "any" is "without limit and no matter what kind." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) "From the earliest days of statehood," the Supreme Court has "interpreted 'any' to be broad, general, and all embracing." (*California State Auto. Asso. Inter-Insurance Bureau v. Warwick* (1976) 17 Cal.3d 190, 195, citing *Davidson v. Dallas* (1857) 8 Cal. 227, 239 [construing "any" to mean "every"].) Thus, the statutory terms "evidence" and "any other evidence" as used in Penal Code section 18175, subdivision (a), logically include the form of "evidence" defined as "hearsay evidence." (Evid. Code, § 1200, subd. (a).)

Just as the WVRO statute at issue in *Kaiser* permits "*any* testimony that is relevant" (Code Civ. Proc., § 527.8, subd. (j), italics added), the GVRO statute permits a court to consider "*any* other evidence of an increased risk for violence" (§ 18175, subd. (a), italics added)—and does so "without limitation" and "without qualification." (*Kaiser*, *supra*, 201 Cal.App.4th at pp. 557, 558.) For purposes of resolving the hearsay issue, we perceive no meaningful distinction between the WVRO phrase "any testimony that is relevant" (Code Civ. Proc., § 527.8, subd. (j)) and the GVRO phrase "any other evidence of an increased risk for violence." (§ 18175, subd. (a).) The GVRO

20

provision does not use the word "relevant," but its plain meaning is that courts may consider "any" evidence that is relevant to show an increased risk for violence. (*Ibid*.) And testimony is just one form of evidence. (Evid. Code, § 140 [defining "evidence" to include "testimony"]; Black's Law Dict. (11th ed. 2019) p. 1778, col. 2 [defining "testimony" as a form of "evidence"].) We therefore find that the broad, unqualified language of section 18175 similarly suggests that the evidence a trial court may consider at a GVRO hearing "is not limited to nonhearsay" evidence. (*Kaiser*, *supra*, 201 Cal.App.4th at p. 558.)

Beyond this similarity to the WVRO statute, however, the text of the GVRO statute contains another positive indication that the Legislature intended to allow the admission of hearsay evidence. As noted, section 18175, subdivision (a) allows the court to consider "any other evidence of an increased risk for violence, *including, but not limited to, evidence of the facts identified in paragraph (2) of subdivision (b) of Section 18155*." (§ 18175, subd. (a), italics added.) The referenced paragraph of section 18155 includes a provision allowing the court to consider "*[d]ocumentary evidence*, including, but not limited to, *police reports* and records of convictions, of either recent criminal offenses by the subject of the petition that involve controlled substances or alcohol or ongoing abuse of controlled substances or alcohol." (§ 18155, subd. (b)(2)(F), italics added.)

Documentary evidence and police reports offered for the truth of the matter asserted are classic forms of hearsay. (Evid. Code, § 1200.) Thus, the inclusion of documentary evidence and police reports in section 18155, subdivision (b)(2)(F)—and its incorporation by reference in section 18175, subdivision (a)—signal that the Legislature intended the terms "evidence"

21

and "any other evidence" as used in section 18175, subdivision (a) to include hearsay evidence.[12]

In our view, it would make little sense to treat section 18155, subdivision (b)(2)(F) as a narrow exception *only* allowing hearsay evidence of alcohol or substance abuse or related convictions. In the first place, the statutory language does not frame it as an exception. Sections 18155 and 18175 both treat the documentary evidence described in this subdivision as being "includ[ed]" within the broader category of "any other evidence of an increased risk for violence." (§§ 18155, subd. (b)(2), 18175, subd. (a).) This affirmatively suggests that the Legislature intended the phrase "any other evidence" to *include* documentary evidence such as police reports. Moreover, we cannot conceive of any rational reason why the Legislature would create a narrow hearsay exception just for evidence of alcohol or substance abuse used to prove an increased risk for violence, but not for actual threats of harm or other evidence used to prove an increased risk for violence.[13] To the extent the statute is ambiguous, we must construe it to avoid such a capricious result. (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340.)

---

[12] The dissent quotes a statement made by the Department in its respondent's brief that "California's GVRO law is silent as to the admissibility of hearsay in a GVRO hearing . . . ." But the Department later submitted a supplemental brief on the hearsay issue at our request. In that brief, the Department argued that hearsay evidence is admissible under "the plain language" of section 18175 and the reasoning of *Kaiser*.

[13] For example, why would the Legislature create a special hearsay exception for abuse of controlled substances or alcohol (§ 18155, subd. (b)(2)(F)), but not for a history of using physical force (*id*. at subd. (b)(2)(B)) or recent acquisition of firearms or ammunition (*id*. at subd. (b)(2)(G))?

Our conclusion that hearsay evidence is admissible in a GVRO hearing is reinforced by the other factors we relied on in *Kaiser*. Like a WVRO or CHRO proceeding, a GVRO proceeding is "procedurally truncated, expedited, and intended to provide quick relief . . . ." (*Kaiser, supra,* 201 Cal.App.4th at p. 557.) These types of proceedings are all intended to prevent a threat of harm and designed to take less than a month to litigate from beginning to end. They all contemplate an initial ex parte or emergency order to be issued immediately for a limited duration of 21 days, followed by a noticed hearing to be held within 21 days of the initial order for the court to determine whether to issue a long-term restraining order. And a GVRO proceeding is also "heard by the court, not a jury, and is decided by the clear and convincing evidence standard of proof" by judges who "are particularly aware of the potential unreliability of hearsay evidence" and "are likely to keep this in mind when weighing all of the evidence presented." (*Ibid.*)

Not only are these statutory schemes similar in structure and purpose, but there is a substantial overlap of subject matter. Specifically, the WVRO and CHRO statutes both state that anyone who is subject to one of its protective orders "shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect." (Code Civ. Proc., §§ 527.6, subd. (u)(1), 527.8, subd. (s)(1).) It would be anomalous to conclude that hearsay evidence may be used to obtain such a firearm prohibition under the WVRO and CHRO statutes, but not under the GVRO statute, which more directly targets gun violence. To resolve any ambiguity, we must adopt "the construction which best serves to harmonize the statute internally *and with related statutes*." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871, italics added.)

Finally, we have reviewed the 2014 legislative history of the GVRO statute for guidance. We do not find it to be particularly helpful in deciding the question before us. The legislative committee reports shed no meaningful light on it.[14] We do note, however, that the provision that ultimately became section 18175 went through several revisions in the legislative process. The language of an early version merely stated that "the court shall consider evidence of the facts identified" in what ultimately became section 18155,

---

[14] One legislative committee report suggests that the GVRO was modeled on the domestic violence restraining order (DVRO) statute (Fam. Code, § 6200, et seq.), as well as gun seizure laws in Connecticut, Indiana, and Texas. (Sen. Com. on Public Safety, Report on Assem. Bill No. 1014 (2013-2014 Reg. Sess.) as amended June 11, 2014, pp. 13, 16-19.) However, this same report also states that the GVRO statute "differs from the domestic violence restraining order system in a variety of ways." (*Id.* at p. 22.) In any event, neither the DVRO statute nor the case law applying it clearly establishes whether hearsay is generally admissible in a DVRO hearing. Family Code section 6300, subdivision (a) states that a DVRO may be issued "based solely on the affidavit or testimony of the person requesting the restraining order." (Fam. Code, § 6300, subd. (a).) This provision applies to any order "issued under this part" (*ibid.*) (i.e., Part 4 of Division 10 of the Family Code), which includes both ex parte DVROs (Fam. Code, §§ 6320-6327) and DVROs after notice and hearing (Fam. Code, §§ 6340-6347). Thus, at least one form of hearsay—affidavits—is admissible in a DVRO hearing. (See also Fam. Code, § 6305 subd. (a)(1) [allowing "written evidence of abuse or domestic violence" for issuance of mutual DVRO].) Two of the three DVRO cases cited by the dissent (all decided after the GVRO statute was enacted) merely noted in passing that *the trial court* had applied the hearsay rule. (*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 115; *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1142.) The third found no error in the admission of hearsay evidence for a non-hearsay purpose, but did not consider or discuss whether the hearsay rule generally applies in a DVRO hearing. (*Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 828, fn. 3.) We have also examined the Connecticut, Indiana, and Texas gun laws and found nothing to assist us in resolving the issue before us. (Conn. Gen. Stat., § 29-38c; Ind. Code, § 35-47-14-1 et seq.; Tex. Health & Saf. Code, § 573.001(h); Tex. Code Crim. Proc., Art. 18.191.)

subdivision (b)(1) and "may consider evidence of any of the facts identified" in what ultimately became section 18155, subdivision (b)(2). (Sen. Amend. to Assem. Bill No. 1014 (2013-2014 Reg. Sess.) June 11, 2014, § 3, ch. 3 [Pen. Code, § 18107].) This provision was later amended to state that "the court shall consider evidence of the facts identified in" section 18155, subdivision (b)(1) and "may consider *any other relevant evidence*, including, but not limited to, evidence of the facts identified in" section 18155, subdivision (b)(2). (Sen. Amend. to Assem. Bill No. 1014 (2013-2014 Reg. Sess.) July 2, 2014, § 3, ch. 4 [Pen. Code, § 18175].) Finally, it was amended again to state that "the court shall consider evidence of the facts identified in" section 18155, subdivision (b)(1) and "*may consider any other evidence of an increased risk for violence*, including, but not limited to, evidence of the facts identified in" section 18155, subdivision (b)(2). (Sen. Amend. to Assem. Bill No. 1014 (2013-2014 Reg. Sess.) Aug. 4, 2014, § 3, ch. 4 [Pen. Code, § 18175].)

This progression indicates that the Legislature deliberately expanded the language of the bill to permit courts to consider not only the specific factors listed in section 18155, subdivision (b), but also "any other evidence" relevant to show "an increased risk for violence." (§ 18175, subd. (a).) To the extent this history is helpful at all, it bolsters our conclusion that the rationale of *Kaiser* applies here as well.

We recognize that a GVRO proceeding implicates the Second Amendment right to bear arms. But the Second Amendment has nothing to say about the admissibility of hearsay evidence. The Legislature has accounted for the importance of the right at stake by mandating a clear and convincing standard of proof. (§ 18175, subd. (b).) The clear and convincing evidence standard reduces the risk of error when particularly important individual interests are at stake, such as parental rights, involuntary

25

commitment, and deportation. (*Santosky v. Kramer* (1982) 455 U.S. 745, 752-766; *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 487.) Once again, the GVRO statute is no different from the WVRO and CHRO statutes in this regard. As we have explained, those statutes also implicate the right to possess firearms; they also require proof by clear and convincing evidence; and they also allow the admission of hearsay evidence or testimony.[15]

In sum, to paraphrase our holding in *Kaiser*: "Considering the fact that the purpose of the [GVRO] statute is to prevent [gun] violence . . . , the expedited nature of the proceeding contemplated by the statute, and the Legislature's directive that the trial court shall receive [any evidence of an increased risk for violence] without qualification, we conclude that the [evidence] that a trial court may consider in making a ruling on a petition pursuant to [the GVRO statute] is not limited to nonhearsay [evidence]." (*Kaiser, supra*, 201 Cal.App.4th at p. 558.) Accordingly, we hold that hearsay evidence is admissible in a GVRO hearing under section 18175. At the same

---

[15] The dissent questions why the Legislature would have required a statement under oath for an emergency or ex parte GVRO, but not for a long-term GVRO after noticed hearing. The legislative history does not answer this question, but the Legislature may have believed that it was important to require a statement under oath for an emergency or ex parte GVRO precisely because it recognized that, in contrast to a GVRO after notice and hearing, the respondent usually will not have sufficient notice and opportunity to contest the petitioner's evidence or produce evidence in defense. As noted, an emergency or ex parte GVRO may be issued without any evidentiary hearing (§§ 18140, 18145, 18155, subd. (a)(2)), and an ex parte GVRO must be issued or denied on the day it is filed or the next court day. (§ 18150, subd. (d).) In any event, requiring a sworn statement is not the same as forbidding hearsay, because an affidavit or declaration is itself hearsay and any sworn testimony may also contain additional hearsay. For example, the Department here submitted the sworn declaration of Detective Garlow to obtain both the temporary GVRO and long-term GVRO, but his declaration was based on the attached hearsay police reports.

time, we caution that courts must bear in mind "the potential unreliability of hearsay evidence, . . . when weighing all of the evidence presented." (*Id*. at p. 557.)

## III

Geoffrey also argues that by considering hearsay evidence, the trial court violated his Sixth Amendment right to confront the witnesses against him. This claim is forfeited because Geoffrey's hearsay objections in the trial court were insufficient to preserve a constitutional claim. (*People v. Redd* (2010) 48 Cal.4th 691, 730.) Even if the claim were preserved, however, the Sixth Amendment's confrontation clause only applies to criminal proceedings. (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 221–222 [confrontation clause does not apply to civil commitment proceedings].) The GVRO statute "establishes a *civil* restraining order process" (§ 18100, subd. (a), italics added) and is not comparable to a criminal prosecution.

In a civil proceeding, the right to confront and cross-examine witnesses derives from the due process clauses of the state and federal constitutions. (*People v. Orey* (2021) 63 Cal.App.5th 529, 559.) Geoffrey has not raised any due process issue on appeal, nor does the record reflect that he did so in the trial court. Even if he had, however, we would also find no due process violation.

When the petitioner calls live witnesses at a GVRO hearing, the respondent has a due process right to confront and cross-examine them. (See, e.g., *CSV Hospitality Management LLC v. Lucas* (2022) 84 Cal.App.5th 117, 124–125 [right to cross-examine testifying witness at WVRO hearing].) Likewise, if the petitioner relies on hearsay evidence, the respondent has a due process right to call the hearsay declarants and cross-examine them on the stand. (See *In re Lucero L.* (2000) 22 Cal.4th 1227, 1244 ["in civil

27

proceedings . . . parties generally have a due process right to cross-examine available hearsay declarants"]; see also *In re Malinda S.* (1990) 51 Cal.3d 368, 382–385 [holding that when juvenile court relies on hearsay social study in dependency proceeding, due process requires that each party receive a copy of the report, have the right to subpoena and cross-examine the investigating officer and persons whose hearsay statements are contained in the report, and be allowed to introduce evidence in rebuttal]; *In re Gary U.* (1982) 136 Cal.App.3d 494, 501 [holding that when juvenile court relies on hearsay probation report in proceeding to terminate parental rights, parent has right to cross-examine not only any law enforcement officer who authored the report, but also "the sources from which that person obtained the information inserted into the report"].)

Geoffrey is therefore correct that he had a right to cross-examine the hearsay declarants as witnesses at the GVRO hearing. (See also § 18121 [no fee for subpoena in GVRO proceedings].) But he elected not to assert or exercise this right. At the hearing (when Geoffrey was represented by counsel), he did not call either the police officers who authored the police reports or the reporting parties quoted in the police reports.[16] Instead, Geoffrey elected to defend himself with his own hearsay exhibits.

---

[16] Although the names of the reporting parties are redacted from the copies of the police reports submitted for the GVRO hearing, Dr. Etchie's report from two months earlier suggests that Geoffrey knew who several of them were. Dr. Etchie's report identified the reporting parties as Geoffrey's pastor and a friend. According to the same report, Geoffrey told Dr. Etchie, "My pastor, my friend and my father, they told lies against me." He said: " 'Everybody's against me – my deacon, my pastor, my father, my friend, the police . . . .' " And even if Geoffrey did not know the identities of all the reporting parties, he could have demanded that they be disclosed so that he could call them as witnesses and cross-examine them at the GVRO hearing. The record contains no suggestion that he did so.

28

Accordingly, we would find no due process violation even if Geoffrey had preserved the issue.

IV

We next consider whether there is sufficient evidence to support the trial court's issuance of the GVRO. A trial court's factual findings on the elements necessary for a restraining order are reviewed for substantial evidence. (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323 (*Rafat*).) In conducting our substantial evidence review, we must take into account the clear and convincing evidence standard of proof mandated by the GVRO statute. (§ 18175, subd. (b); *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*); *Rafat*, at p. 323.)

Clear and convincing evidence requires a finding of high probability. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) Under this standard, the evidence must be so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind. (*Ibid.*)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*O.B.*, *supra*, 9 Cal.5th at p. 1011.) We must therefore determine whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that Geoffrey posed a "significant danger" of gun violence.[17] (§ 18175, subd. (b)(1).) We "review the record in the light most favorable to the prevailing party below and give appropriate

---

[17]    Geoffrey does not contest the trial court's finding that "less restrictive alternatives [than a GVRO] either have been tried and found to be ineffective, or have been determined to be inadequate or inappropriate for the current circumstances." (See § 18175, subd. (b)(2).)

deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, at pp. 1011–1012.)

The GVRO statute does not require a high probability that the subject *will cause* gun violence; it only requires a high probability that the subject poses a "significant danger" of committing gun violence. (§ 18175, subd. (b)(1); see also Sen. Amend. to Assem. Bill No. 1014 (2013-2014 Reg. Sess.) August 21, 2014, § 3, ch. 4 [amending final language of § 18175, subd. (b)(1) to substitute "significant danger" standard for "will cause" standard].) Both the statutory text and legislative history also make clear that the GVRO standard requires "a more attenuated showing" of danger than the DVRO standard because it does not require "a showing of abuse (physical, mental, or threatened) directed at the person seeking the order." (Sen. Com. on Public Safety, Report on Assem. Bill No. 1014 (2013-2014 Reg. Sess.) as amended June 11, 2014, p. 22.)

Applying these legal principles and viewing the entire record in the light most favorable to the trial court's ruling, we conclude there is sufficient evidence to support its finding of a high probability that Geoffrey posed a significant danger of committing gun violence. In multiple Facebook posts, Geoffrey outlined his false beliefs about Bill Gates and the COVID-19 vaccine, attempted to gather followers to defend themselves against a government takeover, discussed his attempts to stock up on ammunition, and encouraged others to do the same. Geoffrey admitted to the police that he had been posting on Facebook about Bill Gates killing millions of people and told the police that "Bill Gates is a murderer." Geoffrey also admitted that he possessed shotguns and had unsuccessfully attempted to purchase ammunition for them at Walmart on the morning of his psychiatric detention.

30

After his visit to Walmart, Geoffrey called an acquaintance in a "rage, ranting about Walmart refusing to sell him firearm ammunition due to him coming up in their system as 'denied.' " Geoffrey told this person it was part of the " 'government[']s plan' " and claimed that " '[p]eople are going to try to get me and I need to defend myself.' " Geoffrey said he had asked his father to fly to California from Ohio to purchase ammunition for him, but his father declined. Geoffrey's father submitted a declaration confirming that Geoffrey had called him about purchasing ammunition to defend himself. Geoffrey also told another acquaintance, " 'I guess I'm just going to have to take things into my own hands.' "

In the days leading up to Geoffrey's psychiatric detention, several individuals were so alarmed about his mental health and Facebook posts that they made reports to the authorities. These individuals included a clinical psychologist, Geoffrey's pastor, and a friend. One of these individuals said "Geoffrey has reported signs of anxiety and paranoia for some time but has refused to seek treatment." According to this person, "Geoffrey's anxiety, delusional thoughts and paranoia ha[ve] rapidly escalated, putting him in a panic state." Geoffrey had expressed to this person "a strong need to defend himself with his firearms against a government takeover."

In his conversation with the police on April 17, 2020, Geoffrey admitted he believed Bill Gates "has the spirit of the anti-Christ in him" and compared him to the "anti-Christ character" in the "end days" of the Book of Revelation. According to Geoffrey, "the things that are being proposed to us are Biblical in proportion."

The trial court could reasonably infer from the evidence that Geoffrey was not forthright with the police about the reason he was trying to purchase ammunition. Even though he had posted on Facebook and told others that he

31

wanted ammunition for his guns to defend himself against a government takeover, he told the police it was because supply chains were breaking down and he might have to hunt for food. Geoffrey repeatedly evaded the question and tried to play word games when asked whether he had made statements about needing ammunition to defend himself—before finally telling the police it was none of their business.

Geoffrey's apparent effort to conceal from the police his true reason for purchasing ammunition supports a reasonable inference that he felt he had something to hide, and that he was not referring to a legally protected form of self-defense when he made statements about defending himself against a "government takeover." Notably, there was evidence that Geoffrey believed various private parties were also part of the government plot or were out to get him, including Bill Gates, the people at Walmart, the staff at Alvarado, the police, and his own father, deacon, pastor, and friend.

The police and PERT clinician believed that "Geoffrey was a potential danger to others" and placed him on a psychiatric hold under Welfare and Institutions Code section 5150. When Geoffrey arrived at the psychiatric hospital, he "remained with significant risk of danger to others as a result of well-developed and well-organized delusional thought processes about the government and various governmental agencies . . . and the philanthropist, Bill Gates . . . ." Three days after his initial detention, Geoffrey was certified as "a danger to others." After conducting a psychiatric evaluation, Dr. Etchie concluded: "Inpatient psychiatric admission is imperative at this time due to the imminent risk of harm to others and the patient's ability and wherewithal to purchase arms and ammunitions and to prevent harm to the patient and to others." In Dr. Etchie's professional opinion, Geoffrey "remain[ed] with significant risk of harm to others, especially, 'people from

32

the government and people connected with the Bill Gates vaccine and the FBI.' "

We acknowledge that the Department's evidence was hearsay, and we take heed of our own admonition that hearsay evidence is potentially unreliable. But there were several different people who independently called authorities with the same concerns about Geoffrey's mental state and attempts to purchase ammunition—none of whom had any evident reason to lie. These individuals included Geoffrey's own pastor and a friend. Their concerns were corroborated by Geoffrey's Facebook posts and his statements to the police, which were documented on the 22-minute body-camera video Geoffrey himself submitted to the court. Geoffrey also submitted his father's declaration and Dr. Etchie's psychiatric evaluation report, which further corroborated the hearsay evidence submitted by the Department.[18] Moreover, Geoffrey had an opportunity to call witnesses to challenge the Department's hearsay evidence at the GVRO hearing. He could have testified himself or he could have called the police officers or the reporting parties to confront and cross-examine them about the information in the police reports. He could also have submitted copies of his own Facebook posts to dispute how they

---

[18]    Geoffrey argues that Dr. Etchie's psychiatric evaluation report contained inaccurate information, including a statement that Geoffrey had "a history of severe mental illness" and another that appeared to question whether Geoffrey was really an attorney and a real estate practitioner. We note that in a separate section of the report entitled "Past Psychiatric History," Dr. Etchie mentioned nothing about Geoffrey having a history of mental illness and acknowledged that he denied having any such history. In any event, it was for the trial court to assess these alleged discrepancies and determine whether they undermined the rest of the report or the credibility of Dr. Etchie's professional opinion that Geoffrey posed a risk of harm to others. On appeal, we must presume that the trial court resolved any such credibility issues in favor of the Department. (*People v. Alexander* (2010) 49 Cal.4th 846, 882–883.)

were described in the police reports.  The trial court could fairly infer from Geoffrey's failure to do so that the hearsay evidence in the police reports was accurate and reliable.  (Evid. Code, § 413; *Williamson v. Superior Court* (1978) 21 Cal.3d 829, 835, fn. 2.)

Considered in its totality, we conclude that the evidence is sufficient to support the trial court's finding by clear and convincing evidence that Geoffrey posed a "significant danger" of gun violence.  (§ 18175, subd. (b)(1).)  Because the Department's hearsay evidence came from multiple sources that were consistent with one another, including Geoffrey's pastor, his friend, his own Facebook posts, and Geoffrey himself, and it was corroborated by other evidence Geoffrey submitted at the hearing, and not otherwise refuted, we conclude that it was sufficiently reliable to support the GVRO.

V

Geoffrey contends that the trial court violated his First Amendment free speech rights by retaliating against him for expressing "strange beliefs" and speaking publicly about buying ammunition.  According to Geoffrey, the trial court erred "by granting the GVRO based on the content of [his] lawful speech."

Geoffrey has not preserved this issue for appeal.  The trial court's minute order from the GVRO hearing and the GVRO itself do not mention anything about a First Amendment issue having been raised by Geoffrey.  Geoffrey's settled statement also does not mention the First Amendment or state that he raised a First Amendment issue in the trial court.  Because the record does not demonstrate that any First Amendment issue was raised below, we conclude that it was forfeited.  In both criminal and civil cases, a constitutional claim is generally forfeited by the failure to assert it in the trial court.  (*People v. Saunders* (1993) 5 Cal.4th 580, 590; see also *Hepner v.*

34

*Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 (*Hepner*) ["In civil cases, constitutional questions not raised in the trial court are considered waived."].)

Even if the issue were preserved, we would reject it on the merits. The First Amendment limits the government's ability to regulate the content of speech, but it "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 489 (*Mitchell*).) Although *Mitchell* involved a criminal case, the same principle logically applies in a civil proceeding. (*Watson v. Perry* (W.D. Wash. 1996) 918 F.Supp. 1403, 1418; *Thomasson v. Perry* (E.D. Va. 1995) 895 F.Supp. 820, 824.) Nothing in the record supports Geoffrey's claim that the trial court issued the GVRO as retaliation against him for his speech or beliefs. Rather, the court made "evidentiary use of [his] speech" to determine whether Geoffrey posed a significant danger of gun violence, as required by the GVRO statute. (*Mitchell*, at p. 489.) This did not violate the First Amendment.

VI

Geoffrey next argues that the trial court violated his Second Amendment right to bear arms by ordering the seizure of his guns. He does not assert that the GVRO statute itself violates the Second Amendment, but he claims that the trial court erred by considering his lawful exercise of Second Amendment rights (i.e., possessing firearms and attempting to purchase ammunition) as a basis for issuing the GVRO.

Once again, neither the minute order from the GVRO hearing nor the GVRO itself mentions anything about a Second Amendment issue having been raised by Geoffrey. Geoffrey's settled statement also does not state that he raised a Second Amendment issue *in the trial court*. The settled

35

statement refers to the Second Amendment only in describing the issues Geoffrey intended to raise *on appeal*. Thus, we conclude that Geoffrey forfeited the Second Amendment issue for appeal. (*Hepner*, *supra*, 52 Cal.App.4th at p. 1486.)

Even if the issue were preserved, we would reject it on the merits for the same reason we have rejected his First Amendment claim. Even if Geoffrey's conduct was protected by the Second Amendment, the trial court was entitled to make evidentiary use of his possession of firearms and his attempts to purchase ammunition—along with other relevant evidence—in deciding whether he posed a significant danger of gun violence under the GVRO statute. Like the First Amendment, the Second Amendment "does not prohibit the evidentiary use" of protected conduct as part of the proof to establish the required elements in a criminal or civil proceeding. (*Mitchell*, *supra*, 508 U.S. at p. 489.) Otherwise, the Second Amendment would prohibit the prosecution in a murder case from presenting evidence that the defendant lawfully possessed a firearm matching the murder weapon. Accordingly, we reject Geoffrey's argument that the trial court violated the Second Amendment by considering his lawful possession of firearms and his attempt to purchase ammunition in deciding whether he posed a significant danger of gun violence.

## VII

Finally, Geoffrey argues that he was wrongly entered into the state and federal firearms and ammunition background check databases. But the trial court made no such order in the GVRO proceeding. We only have jurisdiction to review the order Geoffrey is appealing; we do not have jurisdiction to address other wrongs allegedly committed against him by unknown parties. We therefore decline to decide this issue.

36

## DISPOSITION

The one-year GVRO is affirmed.  Respondent shall recover its costs on appeal.[19]

BUCHANAN, J.

I CONCUR:

AARON, Acting P. J.

---

[19]     We deny Geoffrey's request for sanctions against the City Attorney made for the first time in his supplemental brief.

Dato, J., Dissenting.

This case presents a classic question of statutory interpretation. When it enacted the gun violence restraining order (GVRO) statutes in 2014 (Stats. 2014, ch. 872 (Assem. Bill No. 1014)), did the Legislature intend that all forms of hearsay evidence should be admissible without limitation in a noticed hearing seeking a GVRO? The Legislature's intent with respect to the meaning of a statute is not always crystal clear, and in this instance it might be better characterized as opaque. It is therefore hardly surprising that reasonable judges might disagree.

There is, however, a more fundamental question that will have much to say about how we ultimately decide what the Legislature intended and what the statutes mean. That is because the Legislature itself has provided a framework within which we are to analyze questions about the admissibility of hearsay. Evidence Code section 1200, subdivision (b) succinctly states the generally applicable rule, "Except as provided by law, hearsay evidence is inadmissible." The issue we must decide is whether, in the case of GVROs, the Legislature has otherwise "provided by law" for an exception. And to determine if the Legislature intended an exception, we must first understand the general rule.

The rule against hearsay evidence exists for one overriding and crucial purpose: To make sure results in the courtroom are based on the truth. To expose innocent fibs, outright falsehoods, and all types of fabrications in between, witnesses are ordinarily required to personally appear in court, affirm to tell the truth, and be subject to cross-examination. (See *California v. Green* (1970) 399 U.S. 149, 158.) Courts have long recognized the importance of cross-examination and its crucial role in ferreting out the

truth. (*In re Brenda M.* (2008) 160 Cal.App.4th 772, 777 [" 'Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.' "].)

But it is impossible to cross-examine a witness who isn't there. And in this case, the deputy city attorney who appeared at the hearing merely offered the court San Diego Police Department (Department) reports that memorialized several police contacts with Geoffrey S. at his home over the course of a week in April 2020, near the beginning of the COVID-19 pandemic. In addition to the observations of officers, these reports included statements made by other, sometimes unidentified, persons. They also summarized Facebook posts allegedly made by Geoffrey but did not attach copies. At the same time, the Department's presentation ignored—or at least significantly downplayed—the numerous factual errors in the psychiatric hospital's intake report,[1] as well as the fact that the hearing officer who ultimately dismissed the Welfare and Institutions Code section 5150 hold concluded that Geoffrey had "no known history of diagnosis or treatment" for mental illness and "does not have a mental disorder."[2]

Critically, *not a single witness testified at the hearing*, not even the officers who authored the reports. The deputy city attorney merely argued that the reports proved by clear and convincing evidence that a one-year

---

[1] The report stated that Geoffrey "has a history of severe mental illness" and was "eventually apprehended by police officers," neither of which was true. As evidence of his delusional mental state, the physician wrote, "The patient continues to insist that he is an attorney and a real estate practitioner," which were both true.

[2] Noting that " 'millions of Americans' " hold similar strange beliefs, the hearing officer rhetorically asked hospital staff, " 'Do you believe that everyone who has opinions similar to those held by [Geoffrey] should be incarcerated in mental institutions?' "

GVRO should issue. The court's minute order simply states, "The petitioner has proved the case by a Clear and Convincing Evidence per California Penal Code section 18157 (c)(d)."[3]

The inability to employ cross-examination to expose "the many possible deficiencies, suppressions, sources of error and untrustworthiness" of hearsay evidence is the crux of the rule prohibiting it. (See *Buchanan v. Nye* (1954) 128 Cal.App.2d 582, 585.) Indeed, although Geoffrey (who is self-represented) has not framed his appeal in due process terms, "in 'almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.' "[4] (*Manufactured Home Communities, Inc. v. County of San Luis Obispo* (2008) 167 Cal.App.4th 705, 711.) In short, both the Legislature and the courts of this state have repeatedly recognized that the rule prohibiting the admission of hearsay evidence is of fundamental importance in assuring a fair hearing.[5]

---

[3] Further undesignated statutory references are to the Penal Code. Because there is no section 18157, I assume the statutory reference is a typographical error and the court in its minute order intended to cite section 18175.

[4] The majority dismisses any due process concerns by pointing out that a respondent can always subpoena hearsay declarants in order to cross-examine them. (Maj. opn., *ante,* at p. 28.) Not only is this reasoning broad enough to swallow the entire hearsay rule, but it also would effectively shift the burden to respondents to prove that their possession of firearms does *not* create an unreasonable risk of injury to others.

[5] And this is not just a narrow California issue. The GVRO procedures (Pen. Code, § 18100 et seq.) are California's version of what is known nationally as an Extreme Risk Protection Order (ERPO) or "Red Flag" law. In June 2022, Congress passed and the President signed the Bipartisan Safer Communities Act (Pub.L. No. 117-159). Among other things, this legislation provides grants to states to fund ERPO programs. As a condition of receiving

To be sure, Evidence Code section 1200 itself recognizes that exceptions to the hearsay rule are sometimes appropriate and that the Legislature can "provide" for them.  But given the importance of the rule, we should not lightly imply exceptions or assume the Legislature meant to create them, especially where they are based on ambiguous and diaphanous suggestions of legislative purpose.

To decide if the Legislature wanted to create an exception to the hearsay rule in this case, we would normally begin by examining the words of the statute as the " 'the most reliable indications of the Legislature's intent.' " (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 83, quoting *Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487.)  We would construe those words in context, resolving uncertainties or ambiguities by reference to extrinsic aids such as legislative history and taking into consideration the Legislature's purposes in enacting the legislation.  (*Ibid.*; see also *Walker v. Superior Court* (2021) 12 Cal.5th 177, 194 (*Walker*).)

In my view, the majority opinion starts down the wrong path in its first sentence by focusing on *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550 (*Kaiser*)—a case that dealt with dissimilar language in an entirely different statute—instead of looking to the words of the GVRO statute, section 18175.  Bypassing the relevant statutory language may be understandable.  As the Department candidly concedes, "California's GVRO

---

funding, these state laws must meet certain due process requirements, including "heightened evidentiary standards and proof" that "prevent reliance upon evidence that is unsworn or unaffirmed, irrelevant, *based on inadmissible hearsay*, unreliable, vague, speculative, and lacking a foundation."  (34 U.S.C. § 10152(a)(1)(I)(iv)(III), italics added.)  In other words, the majority opinion construes California law as allowing what federal law says must be excluded as a matter of due process—otherwise inadmissible hearsay—in order to qualify for federal funding.

4

law is silent as to the admissibility of hearsay in a GVRO hearing . . . ." Certainly "[n]othing in the language of the [statute] indicates the Legislature created an explicit hearsay exception to allow hearsay" in noticed hearings requesting a GVRO. (See *Walker, supra,* 12 Cal.5th at p. 195.) Indeed, the word "hearsay" never appears in section 18175. Neither is there any statement indicating that the usual "rules of evidence" do not apply. (*Walker,* at p. 200.) Had the Legislature intended a broad hearsay exception, it would have been a simple matter to say so. It did not. And this, in itself, should give us pause.

The majority opinion avoids grappling with these difficult issues by suggesting this case is just like *Kaiser*. But is it? *Kaiser* involved Code of Civil Procedure section 527.8, subdivision (j), which provides that at the hearing for a workplace violence restraining order, "the judge shall receive *any testimony* that is relevant . . . ." (Italics added.) Did the Legislature mean by this that relevance is the *only* criterion for admissibility, or simply that the court should consider any relevant testimony that is *otherwise* admissible? Even the conditional language of the opinion suggests the answer is less than clear. (*Kaiser, supra,* 201 Cal.App.4th at p. 557 ["Subdivision (f) of [Code of Civil Procedure] section 527.8 *appears to be* one of the exceptions to Evidence Code section 1200, subdivision (b)" (italics added)].) There is no mention of legislative history, and the opinion acknowledges that "we have found very little guidance in the case law." (*Kaiser,* at pp. 556–557.) Nonetheless, according to *Kaiser*, the "plain language of this provision" means that the Legislature "intended to permit a trial court to consider *all* relevant evidence, including hearsay, when deciding whether to issue an injunction to prevent workplace violence pursuant to section 527.8." (*Kaiser,* at p. 557.)

5

Even if we accept that proposition,[6] the language of the GVRO statute is quite different from that used in Code of Civil Procedure section 527.8, subdivision (j). As noted in *Kaiser,* a direction to the trial court to "*receive any testimony that is relevant*" at least "suggests" a rule of admissibility where relevance is the only standard. (*Kaiser, supra,* 201 Cal.App.4th at p. 557, italics added.) In contrast, section 18175, which governs noticed hearings seeking a GVRO, merely says that the trial court "shall consider evidence" of certain factors listed in a different statute (§ 18155, subd. (b)(1)) and "may consider any other evidence of an increased risk for violence . . . ." (§ 18175, subd. (a).) There is no articulated standard for admissibility, relevance or otherwise. In my view, this is hardly language that manifests a clear legislative intent to abandon the hearsay rule and its crucial role in assuring a fair hearing.

There are other critical differences in the two statutory schemes. Code of Civil Procedure section 527.8, the workplace violence restraining order statute, provides for issuance of a temporary restraining order if the petitioner submits a declaration "show[ing] reasonable proof that an employee has suffered unlawful violence or a credible threat of violence by

---

[6]    There is one part of the *Kaiser* analysis that especially concerns me. The statutory language relied on to establish an exception to the hearsay rule tells the court to "receive any *testimony* that is relevant." (Code of Civ. Proc., § 527.8, subd. (j), italics added.) In reaching its conclusion, the opinion substitutes "evidence" for "testimony" so that it purports to hold that all relevant *evidence* is admissible. (*Kaiser, supra,* 201 Cal.App.4th at p. 557.) But while all testimony may be evidence, not all evidence is testimony and the Legislature is presumed to know the difference. (*In re Jessica B.* (1989) 207 Cal.App.3d 504, 518.) At best, then, Code of Civil Procedure section 527.8 should be read to permit in-court *testimony* that includes hearsay statements. And in-court testimony was precisely what was missing from the hearing in this case.

6

the respondent, and that great or irreparable harm would result to an employee." (*Id.*, subd. (e).)  The GVRO statutes similarly provide for issuance of temporary orders of limited duration prior to a formal hearing, but they specify two different types of temporary orders—emergency and ex parte— and identify in considerably greater detail what has to be submitted and how that submission will be evaluated.   Different standards also apply to temporary orders as compared to orders issued after a noticed hearing.

Because a request for a GVRO can arise in a variety of factual settings—from a crisis requiring an immediate response to a low level possible future threat and everything in between, there are different standards and evidentiary rules depending on the exigency and duration of the restraining order.  For example, a 21-day "emergency" GVRO may (and as a practical matter almost always will) issue on nothing but the hearsay affidavit of the law enforcement officer who responded to the crisis. (§ 18125.)  Slightly less urgent, a 21-day "ex parte" GVRO can issue at the request of someone other than a law enforcement officer.  (§ 18150.)  In-court testimony is generally required; however, the court has discretion to allow an affidavit instead.  (§ 18155, subd. (a)(1)–(2).)  Finally, a long term restraining order lasting up to five years—the type we deal with in this case—can issue only after a noticed hearing.  The table below summarizes these distinctions:

7

|  | Emergency | Ex Parte | Noticed Hearing |
| --- | --- | --- | --- |
| **Standard for Issuing the GVRO** | Reasonable cause to believe the subject poses *an immediate and present danger* of gun violence. (§ 18125, subd. (a)(1).) | A substantial likelihood that the subject poses *a significant danger, in the near future*, of gun violence. (§ 18150, subd. (b)(1).) | The subject poses *a significant danger* of gun violence. (§ 18175, subd. (b)(1).) |
| **Scope of Admissible Evidence** | Hearsay affidavit of law enforcement officer admissible. (§§ 18125, subd. (a), 18140, subd. (a).) | Oral testimony in court or affidavit under oath, plus "any additional information provided to the court . . . ." (§§ 18150, subds. (b), 18155, subd. (a)(2).) | The court "shall consider evidence of the facts identified" in section 18155, subdivision (b)(1) and "may consider any other evidence of an increased risk for violence . . . ." (§ 18175, subd. (a).) |

In general, as the urgency decreases, the need to dispense with evidentiary rules and procedural protections should decrease as well. Both types of temporary orders provided for in the statute require, at a minimum, a statement under oath. In the case of the "emergency" order where the urgency is the greatest, a limited class of persons (a law enforcement officer) is permitted to submit an affidavit. The slightly-less-urgent "ex parte" order can be requested by a broader class of petitioners but, generally speaking, requires in-court testimony under oath before the judge.

Yet the interpretation of section 18175 proffered by the majority turns this apparent logic on its head by applying the least restrictive evidentiary rule—all hearsay is admissible without the necessity of any testimony or affidavit under oath—to the proceeding with the least exigency, a request to issue a restraining order after a noticed hearing.[7] Wouldn't we expect just the opposite—more relaxed evidentiary rules to obtain a temporary emergency order, to be confirmed at a formal hearing with the usual and customary evidentiary protections? To put it another way, if the Legislature intended that nothing more than an unsworn police report would permit issuance of an order suspending for five years a citizen's constitutionally protected property interest, why would it require substantially more—i.e., a sworn affidavit or in-court testimony—to issue a 21-day temporary order addressing a demonstrable exigency?

It is true that as to one narrow category of hearsay evidence in GVRO proceedings, the Legislature did recognize an explicit exception to the hearsay rule. Subdivision (b)(2)(F) of section 18155 expressly permits the court to consider "[d]ocumentary evidence, including, but not limited to, police reports and records of convictions, of either recent criminal offenses by the subject of the petition that involve controlled substances or alcohol or ongoing abuse of controlled substances or alcohol by the subject of the petition." The majority opinion construes this express hearsay exception as a

---

[7]     By the time of the noticed hearing in this case, the Department was making no claim of any exigency or imminent risk of gun violence. Indeed, although the settled statement is not completely clear, at oral argument the parties specifically agreed that while Geoffrey was confined in the psychiatric hospital, his shotguns were seized by police. (See generally §§ 1524, subd. (a)(14), 1542.5.) Moreover, the Department offered no evidence that Geoffrey made any threats after his release from the psychiatric hospital following the Welfare and Institutions Code section 5150 hold.

"signal" that the terms "evidence" and "any other evidence" in section 18175 include hearsay evidence. (Maj. opn., *ante*, at pp. 21–22.) I believe the more compelling inference is that the Legislature never intended hearsay to be fully admissible under section 18175, subdivision (a). If it had, there would be no need to carve out a specific hearsay exception for documentary evidence, and the exception under section 18155, subd. (b)(2)(F) would be superfluous.

Anticipating this inference, the majority suggests there is no "rational reason" why the Legislature would create a narrow hearsay exception for evidence of alcohol or substance abuse, but not for threats of harm or other evidence of an increased risk for violence. (Maj. opn., *ante*, at p. 22.) But the language of section 18155, subdivision (b)(2)(F)—creating a very narrow exception—is clear and unambiguous. As to why it is narrow, there is already a well-recognized hearsay exception in the Evidence Code for a party admission. (Evid. Code, § 1220.) Thus, so long as a percipient witness testifies at the hearing (e.g., "I heard the defendant threaten to harm X"), that testimony would not be made inadmissible by the hearsay rule. It is not that the Evidence Code makes it too difficult for the Department to prove its case. The problem here is that the Department—the party with the burden of proof by clear and convincing evidence—failed to offer a single witness to testify to any aspect of any supposed threat.

There is yet an additional reason why I find it difficult to interpret the language of section 18175 as demonstrating the Legislature's intent to create a wholesale hearsay exception for GVROs issued after a noticed hearing. *Kaiser* was decided in 2011, nearly three years before the 2014 passage of Assembly Bill No. 1014 that created the GVRO procedures. Right or wrong, by 2014 *Kaiser* provided an established blueprint for creating a broad

hearsay exception in the context of restraining orders. The statute need only provide that the court shall receive and consider "any testimony that is relevant."

In drafting Assembly Bill No. 1014, however, the Legislature did not adopt that language or otherwise use Code of Civil Procedure section 527.8 as a model. Indeed, the legislative history reflects that the authors modeled their bill not on the workplace violence legislation at issue in *Kaiser*, but rather on the Family Code's domestic violence restraining order statutes enacted many years earlier. (Sen. Com. on Public Safety, conc. of Assem. Bill No. 1014 (2013–2014 Reg. Sess.) Aug. 29, 2014, p. 7 com.) This is readily apparent in the common structure of the two statutory schemes. Like the GVRO process, the domestic violence statutes provide for (1) emergency restraining orders, (2) ex parte orders, and (3) orders issued after a noticed hearing. (See Fam. Code, § 6250 [compare with Pen. Code, § 18125]; Fam. Code, §§ 6300, subd. (a), 6320 [compare with Pen. Code, §§ 18150–18165]; and Fam. Code, § 6340 [compare with Pen. Code, §§ 18170–18197].) Significantly, courts have applied the hearsay rule, or assumed it applied, in noticed hearings for domestic violence restraining orders. (See, e.g., *In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 115 [noting that certain documentary evidence was received "under the business records exception to the hearsay rule" and its contents were admissible under the exception for party admissions]; *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 828, fn. 3 [trial court applied hearsay rule in a domestic violence restraining order hearing]; *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1142 [trial court sustained hearsay objections in domestic violence restraining order hearing].)

11

Where the Legislature has crafted a rule of general application, based on principles of due process, that it has expressly decreed should be applied except as provided otherwise, we should be certain the Legislature has in fact provided otherwise. Unlike the majority, I find the evidence of such a legislative intent in the GVRO statutes thin and unconvincing at best. And the *Kaiser* decision, interpreting a different statute addressing a different issue using different language, cannot supply what the Legislature has failed to provide.


DATO, J.